MARBURY et al. v. KENTUCKY UNION LAND CO. et al.[1]

BERRY et al. v. SAME.[1]

(Circuit Court of Appeals, Sixth Circuit.    May 8, 1894.)

Nos. 145 and 146.

1. CORPORATIONS—GUARANTY OF BONDS AND STOCK OF OTHER CORPORATION.

The charter of a land company gave it powers to acquire mining and timber lands, to take the ore and timber therefrom and manufacture them, and to acquire rights of way "to export" its products, with all powers necessary to the full use and enjoyment of the powers granted; and authorized it, "in furtherance" of those powers, to effect "a temporary or permanent consolidation" with any railroad company. *Held,* that the land company had power to acquire stock of a railway company, and guaranty its bonds and dividends on its preferred stock, in order to secure the construction of a railroad necessary to the success of the land company, thus accomplishing all that a complete consolidation could accomplish, with less risk and responsibility.

2. SAME—CONSIDERATION FOR GUARANTY.

Such guaranty was given by the land company with the assent of the stockholders, on a contract by well-known bankers and fiscal agents to take a very large amount of the bonds so guarantied of a railway company, nearly all the stock of which was owned by the land company, which contract had been substituted for a previous contract, giving another party an option to take a smaller amount of the bonds, at a higher rate of interest, but without a guaranty. *Held,* that the guaranty should not be set aside as without consideration or benefit to the land company, although it was not shown that the party to the original contract was unable to comply with it.

3. SAME.

Other bonds of the railway company, delivered by it to the land company in payment of a debt for advance, were negotiated by the land company, part by sale and part by pledge for loans, on its guaranty, given after the repeal of the clause in its charter permitting it to consolidate with a railway company. *Held,* that such guaranty was also within its powers, the right to borrow money being given by its charter.

4. GUARANTY OF DIVIDENDS—EXTENT OF LIABILITY.

After a land company had guarantied dividends at a certain rate on preferred stock of a railway company, all the property of the railway company was sold on foreclosure of mortgage, and the land company became insolvent, and all its assets passed by statutory assignment for the benefit of its creditors, including future and contingent demands. *Held,* that holders of such stock were entitled, as against the assets of the land company, to its par value, there being nothing to show this to be an unjust capitalization of the guarantied income.

5. CORPORATIONS—INVESTMENT IN STOCK OF OTHER COMPANIES — INTEREST OF THIRD PARTIES.

Exchanges by a corporation of lands for stock of subsidiary companies will not be set aside in equity as ultra vires, where third persons, not parties to the proceedings, have invested money on the faith of the grants of the lands on one hand and of the ownership of the stock on the other, and such money has not been tendered them.

6. FEDERAL COURTS — FOLLOWING STATE PRACTICE — DISTRIBUTION OF ASSETS OF INSOLVENTS.

Gen. St. Ky. c. 44, art. 2, which provides that a fraudulent preference by a debtor shall operate as an assignment for benefit of creditors, being a rule of property, the construction thereof by the state court of appeals, making the mode of distribution of the debtor's assets, as to creditors having liens or collateral securities, the same as in cases of insolvent

[1] Rehearing denied.

decedents, controls the federal courts in the state, even where such decision of the state court was filed after a decree of the United States circuit court was entered declaring such fraudulent preference, but before a decree of distribution in the case. 57 Fed. 47, reversed.

Appeal from the Circuit Court of the United States for the District of Kentucky.

This was a suit by J. Kennedy Tod and others against the Kentucky Union Land Company and others to have an alleged fraudulent preference by the company declared, under the law of Kentucky, an assignment for benefit of its creditors. The circuit court rendered a decree for complainants, and appointed a special commissioner to report on claims filed, and on his report a decree was entered (57 Fed. 47), from which certain creditors, who had intervened, praying that certain guaranty debts of the corporation be declared void, appealed.

Dodd & Dodd, for Marbury et al.

William Lindsay, Grubbs & Morancy, and John W. Rodman, for Berry et al.

Butler, Stillman & Hubbard, Olin, Rives & Montgomery, and Humphrey & Davie, for J. Kennedy Tod & Co. and Central Trust Co.

St. John Boyle, for J. W. Gaulbert et al.

Before TAFT, Circuit Judge, and SEVERENS and RICKS, District Judges.

TAFT, Circuit Judge. These were appeals from a decree of the circuit court of Kentucky allowing certain claims against the estate of the Kentucky Union Land Company, an insolvent corporation. The action below was begun by J. Kennedy Tod & Co., judgment creditors of the land company, who filed a bill averring that the land company had attempted to prefer a creditor, made codefendant, in contemplation of insolvency, and praying that, in accordance with the statutes of Kentucky, such attempted preference might inure to the benefit of all creditors, and that the assets of the corporation should be sold and distributed to all the creditors of the land company, as their interests might appear. The circuit court sustained the averments of the bill as to the attempted preference; decreed that it inured to the benefit of all the creditors, and then proceeded, in accordance with the statute, to bring in all the creditors for the distribution of the entire insolvent estate. A special commissioner was appointed to hear and report on claims filed. He made his report, but submitted certain questions for the decision of the court. It is the decree embodying the answer of the court to these questions that is here appealed from. The first decree of the court, which found the unlawful preference, and ordered the distribution of the estate among the creditors, is not complained of. Marbury & Jones, appellants, were creditors of the land company, and filed an intervening petition, praying that certain guaranty obligations of the land company might be declared void, as ultra vires, and without consideration. The

petition also sought to have set aside and held for naught, as in fraud of creditors, certain conveyances made by the land company to several subsidiary corporations in which the land company took the entire capital stock of the grantee corporations as consideration for the grants. These subsidiary corporations were made parties to the petition by subpoena. The petition was dismissed for want of equity. And this action of the court is assigned for error in the appeal of Marbury & Jones. The questions for our consideration are:

First. Had the Kentucky Union Land Company power, under its charter, and under the circumstances shown in the record, to receive and hold all the stock in a railroad corporation known as the Kentucky Union Railway Company, and guaranty the payment of its bonds and preference stock?

Second. Conceding that the land company had the power to guaranty the payment of semiannual dividends on the preferred stock of the railway company, what is to be the measure of the recovery of the trust company with whom such guaranty was made for the benefit of the preferred stockholders against the assets of the land company?

Third. Should a court of equity, in an action like the one at bar, and under the circumstances of this case, set aside and hold for naught the conveyance made by the Kentucky Land Company to the subsidiary corporations, and bring the land conveyed into court for sale and distribution as part of the assets of the defendant land company?

Fourth. Under the statute of Kentucky forbidding preference in contemplation of insolvency, should creditors with security for their debts be permitted to prove and receive dividends upon their claims in full, or should they be required to wait in the distribution, until unsecured creditors shall have received as much on their claims as the secured creditors receive from their collateral or other security?

The circuit court held that the land company had the power to make the guaranties in question; that the measure of recovery on the guaranty of dividends was such a sum as would yield when invested a return equal to the dividends insured; that equity would not set aside the transactions between the land company and the subsidiary corporations; and that creditors, secured and unsecured, should be allowed to prove their claims in full against the insolvent estate, without regard to collateral held.

It is necessary to state, in as summary way as may be, the facts developed by the record. The Kentucky Union Land Company was organized under a special act of the Kentucky legislature, passed May 6, 1880, and was then known, by the terms of the act, as the Central Kentucky Lumber, Mining, Manufacturing & Transportation Company. The act gave it the right to change its name, and this right it exercised in May, 1888, by assuming the name of the Kentucky Union Land Company. It will be convenient hereafter to refer to it as the "Land Company." By the second section of the act, it was made "capable in law of purchasing, selling,

holding, leasing, conveying, receiving by gift or devise, and disposing of all real and personal property and estate," and of "making all contracts and by-laws, and doing all lawful acts necessary and proper for the business and powers hereby conferred upon" it, "properly incident thereto." By the third section the company was given the power, when authorized by a majority vote of the shareholders, "to borrow money on the credit of the company, not exceeding in amount the capital stock of said company," "and to issue bonds therefor, secured by mortgage on the property of the company." By the fourth section it was permitted to increase the stock of the company to four millions of dollars. The seventh and important section was as follows:

"The said company shall have power to engage in the business of mining and manufacturing in any part of this commonwealth, and it may purchase and lease mineral and timbered lands, and contract for and purchase ore, timber, and machinery for manufacturing the same, and may open and develop mines of iron, coal, or other minerals, and may acquire by purchase or condemnation the necessary right of way for exporting the products of the said mines and the same timber, either in the crude or manufactured state, and may establish and operate such works, rolling mills, sawmills, and stove factories, as may be expedient or necessary in the reduction and manufacturing of ores and the manufacturing of timber, or implements for mining, or cutting and preparing timber; and the said company may cut and prepare timber for market, and ship the same either in logs, plank, or manufactured articles; and shall have all rights and privileges, powers and franchises necessary to the full use and enjoyment of the powers herein granted; and may, in furtherance of the powers granted in this section, effect a temporary or permanent consolidation with any railroad or transportation company, chartered or to be chartered under the laws of this commonwealth; and the consolidated companies may have and exercise the powers of both companies, and act in the name of either of them, or in a joint name, to be agreed upon in the articles or deeds of consolidation."

The land company had acquired by purchase, prior to 1886, mineral and timber lands in eastern and southeastern Kentucky, lying principally in Powell, Wolfe, Estill, Breathitt, Perry, Letcher, Leslie, Clark, and Knott counties, amounting in the aggregate to upwards of half a million acres. By an amendatory act passed April 11, 1890, and accepted by the company, it was given power to increase its common stock to $10,000,000, and to issue $2,000,000 of preferred stock. The fourth section of the amending act was as follows:

"(4) That so much of section seven of said act as authorizes said company to effect a temporary or permanent consolidation with any railroad or transportation company is hereby repealed."

The Kentucky Union Railway Company, to be hereafter referred to as the "Railway Company," was organized under a special act of the Kentucky legislature passed in 1854, which empowered it to construct, equip, and operate a line of railway from a point near Newport or Covington, on the Ohio river, by the nearest practicable route to a point near Cumberland Gap, in the direction of Knoxville, and to build and operate branches running eastwardly through the mineral regions of Kentucky to the state of Virginia. Under this charter the company, prior to 1883, had built and operated

14 miles of road from Kentucky Union Junction, on the Chesapeake & Ohio Railway, to Clay City.

In 1887, the capital stock of the land company was $4,000,000, and that of the railway company was $5,000,000. The stock of both companies was owned by what was known as the "Tarr, Thomas, McGibben & Dodge Syndicate." One F. D. Carley and associates procured the incorporation of the Kentucky Coal & Iron Company, hereafter referred to as the "Coal and Iron Company," with the purpose of acquiring the entire interest in both the land and railway companies. The coal and iron company had express power to own and sell stock in other companies. While the record is not as specific as it might be on the subject, it is perfectly evident that the railway, as constructed, and as projected, was so situated with reference to the lands of the land company as to be a most important factor in increasing the value of its property, and in bringing its mineral and timber products to a lucrative market. It may be presumed that this was the reason why we find the two properties owned by one syndicate in 1887. The coal and iron company paid the Tarr syndicate about $800,000 for both properties, and cleared off a mortgage on both properties for $400,000 in doing so. The purchase price of the properties was paid by the issue of $800,000 of bonds, secured by mortgage on the lands of the land company. This issue was subsequently taken up by the sale of preferred stock in the land company. The coal and iron company for a time held the entire stock in both the railway and land companies. Then the stock of the land company was distributed, $1,600,000 to the stockholders of the coal and iron company, $2,000,000 to F. D. Carley as a bonus for the negotiation or sale of the first mortgage bonds of the railway company, and the balance was put into the treasury of the land company as treasury stock. The entire stock of the railway company was voted for a time by the coal and iron company, and then, shortly before the issue of the first mortgage bonds of the railway company, it was transferred to the land company as its property, and was ever after used as such. At this point the coal and iron company disappears from the case.

In 1888 the railway company made a contract with F. D. Carley, giving him an option to take $2,000,000 of a $3,000,000 issue of bonds secured by first mortgage on the railroad, bearing 6 per cent. interest, at 90 cents on the dollar, with a bonus of $2,000,000 of the stock of the land company. Carley contracted to sell $1,000,000 of these bonds to J. Kennedy Tod & Co. at 92½ cents. This sale was not completed, for Tod & Co. proposed instead to take $2,500,000 of the bonds if their form was somewhat changed, and a different plan of floating them was adopted. The plan was this: that the interest on the bonds should be changed from 6 per cent. to 5 per cent., and the land company should guaranty their payment, and that the land company should transfer 6,000 shares of $100 par value of the stock of the railway company, upon which both the land and railway companies should guaranty the payment of 5 per cent. dividends, payable semiannually. Tod & Co. proposed to give

90 cents on the dollar for the bonds, accompanied by two shares of the guarantied stock for each bond as a bonus. The Carley contract was rescinded, and this plan was adopted. It was part of the plan that the proceeds of 500 of the 2,500 bonds sold should go into the treasury of the land company, to represent, as it was said, the value of the 14 miles of constructed road which was now to be mortgaged, and which the land company, as the sole owner of the stock of the railway company, was deemed to own, prior to the mortgage, free from incumbrance. The bonds and mortgage of the railway company, with the guaranty of the land company on the bonds, were issued in accordance with Tod & Co.'s suggestion in March, 1889, but were dated as of July, 1888. At the same time the railway company guarantied the payment of semiannual dividends of $2\frac{1}{2}$ per cent. on the 6,000 shares of its stock received from the land company, and gave an income bond to the Central Trust Company of New York to secure the payment of the same; the bond stipulating for the payment of the dividends regularly, and the payment of $600,000 at the end of 100 years. It was provided that this $600,000 was to be invested at that time by the trust company and its earnings were to be used to pay, as far as they would, the dividends accruing due thereafter. In this same bond agreement the land company covenanted with the trust company to pay the dividends in case the railway company should default, and the following was indorsed on each stock certificate:

"For value received, the Kentucky Union Land Company agrees and guaranties that the holder of the within stock shall receive dividends of $2\frac{1}{2}$ per cent. thereon on the 1st days of July and January of each year, beginning with the 1st days of July and January of each year, beginning with the 1st day of July, 1889. Witness the name of the Kentucky Union Land Company, hereunto signed by its president, and its corporate seal by its secretary."

In the present litigation the first mortgage bondholders are represented by J. Kennedy Tod & Co., and the holders of the preferred stock are represented by the Central Trust Company.

The projected railroad was constructed to Jackson, Ky., a distance of ninety-odd miles, at a total cost of $3,500,000. Of this sum $2,667,115 was paid, and the remainder was owing as a floating debt, when a receiver was appointed in the suit to foreclose the mortgage on the railway. The mortgage has been foreclosed, and the railway sold at a price which has not paid the first mortgage bonds. Of the amount of cash which was paid to construct the railway, $1,800,000 was obtained by the railway company as proceeds of the 2,000 first mortgage bonds it issued, $250,000 was secured from county subscriptions, and the balance, amounting to about $600,000, was paid out of the treasury of the land company. To repay this indebtedness the railway company, July 5, 1890, issued a second mortgage to secure bonds amounting to $1,300,000, only $800,000 of which were actually issued, and they were all turned over to the land company. The land company guarantied the payment of the bonds, and sold $395,000 of them at 70 cents on the dollar, pledged $204,000 of them to secure a

loan from Tod & Co., and pledged substantially all the remainder of the bonds to secure other loans with Kentucky banks. J. W. Gaulbert was recognized by the court below as the representative of the second mortgage bondholders.

Between September, 1889, and November, 1890, the executive officers of the land company organized five subsidiary corporations, to whom the land company conveyed certain of its lands and buildings in exchange for all the stock of the companies except enough to qualify directors therein. The first of these was organized October 3, 1889, with a capital stock of $500,000, as the Kentucky Union Lumber Company, to which the land company conveyed land, and a sawmill, a planing mill, and other improvements at Clay City. The capital stock was pledged with Inman Swann & Co. to secure a loan evidenced by the obligation of both the land and lumber companies, amounting to $230,000, the proceeds of which were used in improvements. The loan was secured by mortgage of the lumber company's land and plant.

The second subsidiary company, with a capital of $4,000,000, was organized March 5, 1890, as the Three Forks City Company, and the land company deeded to it 2,700 acres of land, upon which the land company had previously issued a mortgage of $175,000. The consideration was the stock of the new company, and $370,000 of 6 per cent. bonds issued by it. The bonds were subsequently deposited with Tod & Co. as collateral for a loan to the land company. Some of the stock was sold at 10 cents a share, and $18,550 realized for the land company.

Another was the Kentucky Industrial Consolidation Company, with common stock of $2,000,000 and $2,000,000 preferred. To this company the land company deeded 400 acres, with manufacturing plants and other improvements on it. The land company received the stock, and deposited 12,000 shares of the common stock and 19,700 shares of preferred stock with Tod & Co., to partly secure a loan of $200,000.

Another was the Kentucky Union Improvement Company, with a capital stock of $50,000. To this company the land company deeded lands in Clark county near Winchester. The stock received for the conveyance was deposited by the land company to secure a loan of $25,000 from the Second National Bank of Louisville.

Finally, the executive officers of the land company organized the Kentucky Land & Title Company for the purpose of taking title to all the remaining lands of the land company, except the town site at Jackson, and selling the same. It is not necessary to notice this company further than to say that before the plan was completed, the receiver in this case was appointed, and, on his petition, all the stock of the new company was turned over to him by order of court, and, since this appeal was perfected, the new company has reconveyed to the land company all the land received from it. This has been made to appear to the satisfaction of the court since the case was submitted.

With this resumé of the facts, we come to the consideration of the four questions stated at the opening of this opinion.

First. Was it within the power of the land company to own the stock and guaranty the bonds and preference stock of the railroad company? The guaranties are attacked on two grounds: First, it is said that whether beneficial to the land company or not, they were wholly beyond its charter powers; and, second, that, even if it was within the power of the company to guaranty the debt of a railway company under circumstances where the guaranty was necessary to secure the construction of a railway which would be beneficial to the land company, the facts of this case, of which the present holders of the bonds had full notice, show that the guaranty was unnecessary, was without consideration, and was of no benefit either to the railway company or to the land company.

We may, then, first inquire into the general powers of the land company. The land company was given power by its charter (1) to acquire mining and timber lands; (2) to take from them the ore and timber; (3) to erect and operate factories of all kinds, and manufacture the ore and timber into finished products; (4) to acquire rights of way by condemnation over which to export either the crude or finished products; (5) to have all powers necessary to the full use and enjoyment of the foregoing powers; (6) in furtherance of the powers given in 1, 2, 3, and 4, to effect a temporary or permanent consolidation with a railroad or transportation company.

The land company acquired nearly all the stock in the railway company and guarantied its bonds. Assuming that the officers of the land company had reasonable ground for supposing that this would be ultimately beneficial to the land company in its mining, lumbering, and manufacturing business, are the two things not within the power of the land company?

It is well-settled law in this country and in England that a corporation is impliedly prohibited from doing anything which it is not expressly permitted by its charter to do, or which is not fairly incidental and necessary to the enjoyment of that which is expressly permitted. It is usually not permitted to acquire stock in another corporation, because, unless some other intent is manifest from the charter, it is presumed that in conferring the charter powers the state intended them to be exercised solely through the agency of the corporation upon whom they were conferred, and not by delegation to the officers of another corporation. Marble Co. v. Harvey, 92 Tenn. 115, 20 S. W. 427. Another reason why one corporation may not acquire stock in another, which is equally cogent to forbid it to guaranty the obligations of another, is that the state which conferred the franchise, as well as the stockholders who invested their capital in the enterprise, and the creditors who advance money on the faith of it, have the right to rely on the company's not engaging its funds or risking its property in any business which is not expressly or impliedly permitted by its charter.

A leading case is that of Davis v. Railroad Co., 131 Mass. 258. There it was held to be beyond the power of a railroad company to guaranty payment of the expenses of a musical festival, which, it was supposed, would largely increase the business of the rail-

way company, because the stockholders of the railroad company had the right to object to risking the funds of the railroad company in a business so foreign and so different from that of the transportation of passengers as a musical festival. The opinion in the case is a learned one, and was delivered by Mr. Justice Gray. He summed up as follows:

"The holding of a 'World's Peace Jubilee and International Musical Festival' is an enterprise wholly outside the objects for which a railroad corporation is established; and a contract to pay or guaranty the payment of the expenses of such an enterprise is neither necessary nor an appropriate means of carrying on the business of the railroad corporation, is an application of its funds to an object unauthorized and impliedly prohibited by its charter, and is beyond its corporate powers. Such a contract cannot be held to bind the corporation by reason of the supposed benefit which it may derive from an increase of passengers over its road, upon any grounds that would not hold it equally bound by a contract to partake in or to guaranty the success of any enterprise that might attract population or travel to any city or town upon or near its line."

In the case of Colman v. Railway Co., 10 Beav. 1, Lord Langdale, M. R., held that the Eastern Counties Railway Company, organized for the purpose of operating a railway running from London to the eastern coast of England, had no power to guaranty the dividends upon the stock of a steamship corporation organized for the purpose of transporting passengers from the terminus of the railroad company to Holland and the continent. Lord Langdale said:

"Ample powers are given for the purpose of constructing and maintaining the railway, and for doing those things required for its proper use when made; but I apprehend that it has nowhere been stated that a railway company, as such, has power to enter into all sorts of other transactions. Indeed, it has been very properly admitted that railway companies have no right to enter into new trades or business not pointed out by their acts; but it has been contended that they have a right to pledge, without limit, the funds of the company for the encouragement of other transactions, however various and extensive, provided the object of that liability is to increase the traffic upon the railway, and thereby to increase the profit to the shareholders. There is, however, no authority for anything of that kind. * * * To pledge the funds of this company for the purpose of supporting another company, engaged in a hazardous speculation, is a thing which, according to the terms of this act of parliament, they have not the right to do."

Another case is that of the East Anglian Rys. Co. v. Eastern Counties Ry. Co., 11 C. B. 775. In that case it was held that one railway company could not maintain an action against another upon an agreement made by the latter to lease the former, and to pay the expenses incurred by the former in soliciting and promoting bills in parliament for its extension and improvement. Chief Justice Jervis, in delivering the judgment of the common pleas court in banc, speaking of the powers of the railway companies, said:

"They cannot engage in a new trade, because they are a corporation only for the purpose of making and maintaining the Eastern Counties Railway. What additional power do they acquire from the fact that the undertaking may in some way benefit their line? * * * Every proprietor, when he takes shares, has a right to expect that the conditions upon which the act was obtained will be performed; and it is no sufficient answer to a shareholder expecting his dividend that the money has been expended upon an undertaking which at some remote period may be highly beneficial to the line."

We have cited the foregoing cases to show what the objections are to acquisition of stock by one company in another, and to the guaranty by one company of another's obligations, in order that we may properly judge whether such objections can be sustained in the case at bar. The clause of the land company's charter giving it the power of temporary or permanent consolidation with a railway company is an express permission to it to give a partial control over its property and enterprise to the owners of the railway. It is further an express permission to risk the entire property of the land company in the business of railroading, for a permanent consolidation with a railroad company could mean nothing less. It is obvious that the legislature, in conferring this unusual power upon a mining and manufacturing company, fully recognized the fact that, without a railroad to reach its mineral and timber lands, such a company could not possibly be a success. For this reason it was willing to empower it to encourage the building of the necessary railroad, even to the extent of embarking its entire property in the success of the enterprise by a union of all its interests with those of the railway company. In this connection, the fact that the original name given to the land company was the Central Kentucky Lumber, Mining, Manufacturing & Transportation Company is to be noted. And still more significant is the power given the company to condemn a right of way "to export" its products. The place and manner of inserting in the seventh section of the charter the clause concerning consolidation are worthy of remark. After detailing with some redundancy the powers which the corporation may exercise in its mining, lumbering, manufacturing, and shipping business, the section proceeds: "And shall have all rights and privileges, powers and franchises necessary to the full use and enjoyment of the powers herein granted; and may, in furtherance of the powers granted in this section, effect a temporary or permanent consolidation with any railroad or transportation company," etc. The meaning of the legislature would be well interpreted by reading the two clauses thus: "And shall have all the powers necessary to the full use and enjoyment of the powers herein granted, even to the extent of effecting a temporary or permanent consolidation with a railroad company," etc. If now, as already said, this permits the land company to part with complete control over its own business, and to risk all its property in the business of railroading, it is difficult to see why there should not be included in such a power, as a part of, or less than, the whole, the right to acquire the stock in a railroad company, and to guaranty its bonds. In this wise the land company could retain complete control over the railway company, and need not risk all its property in the railroad business. The objections to such a course are entirely removed by the fact that the state intended, and the creditors and stockholders knew from the charter, that the land company could go into the railroad business, and had the power to share control of its business with the owners of a railroad. Nor could the state object that it was a perversion of the purposes for which the railway company was

organized that a mining and manufacturing corporation should acquire a controlling share of its stock, because the charter of the railway company expressly permitted other corporations to become owners of its stock.

The learned circuit judge in the court below, in a well-reasoned opinion, supported by authority, held that what was done here was a temporary consolidation within the meaning of this charter. In attacking this view, much stress is laid by counsel for the appellants on the fact that mention is made, in the clause authorizing union, of articles or deeds of consolidation, from which it is vigorously contended that the only consolidation permitted is a union evidenced by formal articles duly filed in a public office. The clause referred to is as follows: "And the consolidated companies may have and exercise the powers of both companies, and act in the name of either of them, or in a joint name, to be agreed upon in articles or deeds of consolidation." It may be suggested, in answer to this argument of appellants, that, while formal articles of consolidation may be proper in permanent consolidation, they are not required in mandatory language. More than this, a temporary consolidation must, in its nature, be less formal, and the union in name and property of companies soon to be separated be less complete. The words might be properly held to apply, therefore, only to the permanent consolidation.

But why is it necessary to show that what was done in this case was in fact a complete consolidation within the statute, to make it lawful? It seems to us that the purchase of the stock and guaranties can be supported on the ground that, even if they did not constitute a consolidation, they were legitimate steps towards a consolidation. They involved the exercise of powers similar to, but less extensive than, that of consolidation, and may fairly be said to have been included in it, as the part is included in the whole. It would be strange, indeed, if the land company had power, in order to encourage the construction of a railroad, to embark in the enterprise its total capital, with a railway company as a partner, and did not have power to accomplish the same purpose by risking only part of that capital.

The question of the construction of a charter is often a mixed question of law and fact, and is so influenced by the surrounding circumstances that the application of decided cases is more or less remote on this account. Nevertheless it may be well to refer to some of the many authorities which illustrate the extent to which courts have gone in supporting the exercise of powers by a corporation which were not expressly conferred in the charter, but which were held to be fairly included in the expressed powers.

In Green Bay & M. R. Co. v. Union Steamboat Co., 107 U. S. 98, 100, 2 Sup. Ct. 221, the charter of a railroad company empowered its directors to make such agreements with any person or corporation whatsoever "as the construction of their railroad or its management and the convenience and interest of the company and the conduct of its affairs may, in their judgment, require." The General Laws of Wisconsin of 1853 authorized the company to make

such contracts with any other railroad company having its terminus on the eastern shore of Lake Michigan as would enable the roads to run in connection with each other in such manner as was deemed beneficial to their interests, and "to build, construct, and run, as part of their corporate property, such number of steamboats or vessels as they may deem necessary to facilitate the business of such company or companies." The question was whether the railroad company could hire a steamboat and guaranty its owner a gross income for the season. The general railroad act of 1872 authorized any railroad corporation of Wisconsin to accept from any other state any additional powers and privileges applicable to the carrying of persons and property by railway or steamboat, and to use them in said state. The railroad in question extended across Wisconsin from the Mississippi river to Lake Michigan. Mr. Justice Gray, in delivering the opinion of the court, said (page 100, 107 U. S., and page 221, 2 Sup. Ct.):

"The general doctrine upon this subject is now well settled. The charter of a corporation, read in connection with the general laws applicable to it, is the measure of its powers; and a contract manifestly beyond those powers will not sustain an action against the corporation. But whatever, under the charter and other general laws, reasonably construed, may fairly be regarded as incidental to the object for which the corporation is created, is not taken to be prohibited. Thomas v. Railroad Co., 101 U. S. 71; Attorney General v. Railway Co., 5 App. Cas. 473; Davis v. Railroad Co., 131 Mass. 258."

After setting out the charter and general statutory powers of the railroad company under the laws of Wisconsin already referred to, the justice continued:

"These statutes show that the legislature of Wisconsin, recognizing the fact that from the geographical situation of the state the railroads which traverse it form part of a line of transportation extending across the continent, intended to confer upon the corporations owning such railroads very large powers of contracting with other corporations owning railroads or steamboats, whose course includes connecting parts of the same great line of transportation. To build and run, as part of the defendant's corporate property, such number of steamboats on Lake Michigan as it might deem necessary to facilitate its business, would be within the power expressly conferred by the statute of 1853; and we are of opinion that, taking into consideration all the statutes above quoted, it was equally within its corporate powers to hire, either by the trip or by the season, steamboats belonging to others running from its eastern terminus along the Great Lakes eastward, or to employ such steamboats to carry passengers and freight, in connection with its own railroad and business, under an agreement by which it guarantied to the proprietors of the boats that their gross earnings for the season should not fall below a certain sum."

Now, it will be observed that the power to contract given in the charter of this railroad, if it stood alone, would not have warranted the hiring of the steamboat, or the guaranty of its gross earnings. Pearce v. Railroad Co., 21 How. 442; Colman v. Railway Co., 10 Beav. 1. Nor would the right to avail itself of privileges in running steamboats, granted the corporation by other states to be exercised in those states, have conferred such a power in Wisconsin. Moreover, so far as the report shows, there had been no such legislation in other states. The whole case indicates that the court, looking to the manifest necessity for steamboat connection in the successful operation of such a railroad, and to the rec-

ognition of that necessity by the legislature in conferring the power to build and run steamboats, and in other legislation, were of opinion that the power to secure steamboat connection by such guaranty was within the incidental powers of contracting, because such a power was of the same character as that of owning and running a steamboat expressly conferred, and involved less responsibility and risk of loss for the railroad company.

And so in this case, looking to the manifest necessity there was for the construction of a railroad in order to make the land company's project a success, and looking to the emphatic recognition of that necessity by the Kentucky legislature in permitting either a temporary or permanent consolidation with a railroad company, we think that the power to secure the construction of a proper railroad by taking its stock and guarantying its bonds was fairly within the incidental powers conferred in such ample language, because it accomplished all that a complete consolidation could accomplish without so much risk or responsibility for the land company.

In Branch v. Jesup, 106 U. S. 468, 478, 1 Sup. Ct. 495, it was held that a power in a railroad company to incorporate its capital stock with the stock of another company included as a lesser power the right to sell its road and franchises.

In Hill v. Nisbet, 100 Ind. 341, authority conferred upon a railroad corporation by statute to buy a railroad, or to consolidate with another corporation owning it, was held to include the power to buy stock in the latter corporation. See, also, Ryan v. Railway Co., 21 Kan. 365; Wehrhane v. Railroad Co., 4 N. Y. St. Rep. 541.

In Smead v. Railroad Co., 11 Ind. 104, a railroad company was chartered for the specific purpose of constructing a railroad from Indianapolis to the Ohio state line, to connect there with a certain Ohio railroad. It was given power to make such contracts and agreements with the connecting road for the transportation of freight and passengers and for the use of its road as to the board of directors might seem proper. Under this general power it was held that the Indiana corporation might give its bills and promissory notes to the Ohio corporation to enable the Ohio corporation to change its gauge, and thus make the connection between them more efficient.

In Low v. Railroad Co., 52 Cal. 53, a railroad company with power to lease the road of another company was held to be authorized to guaranty the bonds of the lessor corporation.

The foregoing cases illustrate how a more extensive power has been held to include a less power of the same character. Other cases may be referred to to illustrate how powers not included within any express power have yet been held to be fairly incidental to the main and expressed objects of a corporation.

In the case of Ft. Worth City Co. v. Smith Bridge Co. (decided by the supreme court of the United States, January 15, 1894) 14 Sup. Ct. 339, it was held that a company organized under the laws of Texas "for the purchase, subdivision, and sale of land in cities," which owned a large amount of land near the city of Ft. Worth, separated from the city by the Trinity river, had the power, as fairly

incidental to the main object of its incorporation, to make a contract with a bridge company to pay one-third of the cost of a bridge to be built over Trinity river to connect its land with the city, even though the bridge was to be public property.

In Vandall v. Dock Co., 40 Cal. 83, where a corporation was organized for the purpose of buying, improving, selling, and otherwise disposing of real estate, it was held that the corporation might properly appropriate a portion of its funds to a railroad running in the neighborhood, for the purpose of increasing the facilities and lessening the cost of transportation to its property.

In Watt's Appeal, 78 Pa. St. 370, a corporation owning a very large body of lands had power by its charter to aid in the development of minerals and other materials and to promote a settlement and clearing of the country. It was held that the building of sawmills and an hotel for the accommodation of those having business in connection with carrying out the prime object of the corporation was within the corporate powers.

In Whetstone v. University, 13 Kan. 320, it was held by the supreme court of Kansas, Mr. Justice Brewer delivering the opinion, that a town-site corporation, organized for the purpose of locating and laying out a town site and making improvements therein, with power to acquire and convey at pleasure all such real and personal estate as might be necessary and convenient to carry into effect the objects of the corporation, had the power to donate a few of its lots for the purpose of procuring the erection of a school building within a short distance of the property.

The cases last cited are all of them stronger cases than the one at bar, for in all of them the courts were obliged by construction to go outside and permit the investment of the property of the company in a business not expressly authorized by the charter. Here we keep within the letter of the charter, for here the company has the right to embark its entire capital and risk it all by consolidation with a railway company in the business of building and running a railroad, and we only hold that, having such a power, it has the right to do less than that, and risk only a part of its funds by lending its credit to such a railway company, and retaining control of it by owning its entire stock.

We now come to the second objection to the validity of the guaranties. It is said that, conceding the power to guaranty the bonds of the railroad if it was necessary to secure the construction of the railroad to do so, the evidence discloses that it was in this case wholly unnecessary, and conferred no benefit on the land company which it would not have enjoyed without it. As Tod & Co., the purchasers of the bonds, and the present holders, knew all the facts, it is contended that the total absence of probable benefit from the guaranty to accrue to the land company, which was a condition precedent to the lawful exercise of the power, destroys the validity of the guaranty in the hands of Tod & Co.

In the first place, the power being conceded, the question of determining the occasion when its exercise will be beneficial to the corporation is one largely in the discretion of the stockholders upon

whom it is conferred. A court will be very slow to set aside a contract as ultra vires because not beneficial to the corporation, where the general power to make it is conceded, and when the stockholders, at the time it was made, with the lights they then had, considered it to be beneficial. These guaranties were entered into by the stockholders at a duly-called meeting, without a dissenting voice, and no stockholder since has objected to them. The statement for the appellants is that the railway and land companies made a contract with Carley in 1888, by which, for a bonus of $2,000,000 of land company stock, he agreed to take two millions of first mortgage 6 per cent. bonds of the railway company, not guarantied by the land company, at 90 cents on the dollar of par value; that before this contract could be carried out, and without any evidence that Carley was unable to comply with it, the companies, with his consent, rescinded it, allowed him to keep his stock, and substituted the contract with Tod & Co., which required the land company's guaranty. In the first place, the record does not disclose what the final contract with Carley was. It is referred to in the resolution of the railway company as an "option" to take two millions of bonds at 90 cents within a year. If it was merely an option, it would not bind him to take any bonds at all. In the second place, it is not claimed that he was to take more than $2,000,-000 of the bonds, while Tod & Co. took and paid for $2,500,000. But, even if there had been a binding contract on Carley to take as many bonds as Tod & Co. took, we should not hold that the change of contracts was without consideration or benefit moving to the land company. We may very well presume that it was properly thought by the stockholders to be to the advantage of the land company to obtain the contract of well-known bankers and fiscal agents like Tod & Co. in exchange for the obligation of Carley. Such a presumption is not rebutted by failure to show as a fact that Carley was not able to complete his contract. Many a man is regarded as financially very strong whose ability to carry out such a contract as this was may be a matter of conjecture. The advance of two or three millions of dollars is so large a transaction that to make certain of its completion by procuring the undertaking of one whose ability in such matters has been proven and is well known is often worth very great concessions. Tod & Co. were under no obligation to take $2,500,000 of the bonds, and they only did so on the faith of the land company's guaranty. The consideration moving from them for the guaranty was the money they paid. On the whole case, we are of opinion that the Tod contract was substituted for the Carley contract in entire good faith, and because the stockholders of the land company thought, and had reasonable ground for thinking, it was best for their company and its interests to do so.

It is claimed that these guaranties of the first mortgage bonds and the preference stock were entered into after the debts of the appellants were contracted, and after they had a right to object to a diversion of the assets of the land company to unauthorized objects. Whether this claim, if true, would affect the question need not be discussed, because it is not true. The contract with Tod & Co.

was made in March, 1889, and no claim of any of the appellants antedates that. The mortgage was dated back to July, 1888, and so were the guaranties, but the obligation to give the guaranty was entered into in March, 1889.

We may notice at this point another charge against the good faith of this transaction, based on the fact that not until the guaranty was proposed did the stock of the railway company appear in the name of the land company. Up to that time it had been held in the name of the coal and iron company. The intimation is that the placing of it in the treasury of the land company was part of a fraudulent scheme on Tod & Co.'s part to procure the guaranty of the land company on the railway company's bonds, the only purpose being to give the land company such an appearance of interest in the railway company as to justify the guaranty. There is nothing in the charge. The purchase price of the entire interest in both companies had been met by the issue of $800,000 of bonds by the land company. For this, preference stock was afterwards substituted. As the land company was thus made to pay for the property of both companies, it was natural that it should become the owner of the railway by becoming the holder of its stock; and this relation increased the propriety of the land company's assisting the railway company to float its bonds.

Consideration thus far has been given to the land company's guaranty of the first mortgage bonds and of the preference stock of the railway company. The guaranty of the second mortgage bonds of the railway company was entered into after the clause in the land company's charter permitting it to consolidate with a railway company had been repealed. As already stated, these bonds, amounting to $800,000, were delivered by the railway company to the land company in payment of advances by the latter to the former, and were negotiated by the land company, half by sale, and the other half by pledge for loans, and the proceeds went into the treasury of the land company. It is thus apparent that the principal debtor on these bonds is the land company, and that the money paid for them went to it and not to the railway company. Having been delivered to it to satisfy an actual debt, it was plainly within the power of the land company to guaranty the bonds, in order to sell them, and realize the benefit of the intended payment. In doing so the land company was merely borrowing money, as it had the right to do under its charter, and was incurring a liability not absolute, but only contingent. The power of the land company to enter into such an obligation for such a purpose is completely established by the case of Railroad Co. v. Howard, 7 Wall. 392. In that case it was held that a railroad corporation, with power to issue bonds for the construction of its road, might guaranty the bonds of cities and counties, which had been lawfully issued for the purpose of aiding the railroad in the construction. In this case the land company had the power to issue bonds for its own purposes, the railway company had the power to issue bonds to pay its lawful debts, and the land company had power to receive them in payment of a debt due to it. If so,

the land company had the right to realize on the bonds, and, as a means of doing this, to guaranty their payment. In Arnot v. Railway Co., 67 N. Y. 315, it was held that, even if the guaranty of bonds by a railway company had been originally ultra vires, the fact that they had come into the hands of the guarantor after their first issue, and had been reissued to raise money for the guarantor, made them binding obligations of the guarantor. See, also, Rogers L. & M. Works v. Southern Railroad Ass'n, 34 Fed. 278.

For the reasons stated, we are of opinion that the guaranties of the land company, which Marbury and Jones, in their intervening petition, prayed the court to declare null and void, were binding, and that the relief sought in respect of them was properly denied.

Second. We come now to the question of the proper measure of the claim of the Central Trust Company representing the preference stockholders of the railway company. The contract of the land company was that the railway company would pay to those stockholders 2½ per cent. on $600,000 semiannually. The railway company has ceased to be. Its assets have been sold in a foreclosure suit, and the possibility that any dividends will be paid by it is entirely gone. The land company is insolvent, and its assets are to be finally distributed. The condition of the two companies destroys the contract, and in such a case the measure of damages properly includes those which are prospective. Sedg. Dam. § 90; Amos v. Oakley, 131 Mass. 413. Moreover, by virtue of the statute under which this action is brought, the preference found by the circuit court to have been made by the land company operated as an assignment of all its assets, and inured "to the benefit of all its creditors in proportion to the amount of their respective demands, including those which are future and contingent." Gen. St. Ky. c. 44, art. 2, § 1. The difference between the pecuniary condition of the stockholders in perpetual receipt of dividends and their present condition is represented by such a sum as would produce forever the payment of 2½ per cent. semiannually, which the circuit court found to be a sum equal to the par value of the stock. There is nothing in the record to show that this is an unjust capitalization of the guarantied income, and we find no error in it.

Third. The next question is in regard to the subsidiary corporations. It is well settled in this country that one corporation is prohibited from investing its property in the capital stock of another, unless there is express power to do it, or unless there is something peculiar in the express powers from which it can be fairly implied. Marble Co. v. Harvey, 92 Tenn. 115, 20 S. W. 427; Franklin Co. v. Lewiston Sav. Bank, 68 Me. 43; Mechanics & W. M. Mut. Sav. Bank v. Meriden Agency Co., 24 Conn. 159; Sumner v. Marcy, 3 Woodb. & M. 105, Fed. Cas. No, 13,609; New Orleans, F. & H. S. S. Co. v. Ocean Dry Dock Co., 28 La. Ann. 173; Central R. Co. v. Pennsylvania R. Co., 31 N. J. Eq. 475, 494; Valley Ry. Co. v. Lake Erie Iron Co., 46 Ohio St. 44, 18 N. E. 486. This does not prevent a corporation from receiving the stock of another in payment of, or in security for, a debt in due course of business (Howe v. Carpet Co., 16 Gray, 493), but it prevents a deliberate and permanent investment of a corporation's assets in the

stock of another. Now, we find nothing in the charter of the land company which authorized it to organize and take all the stock in one or more subsidiary corporations. The manifest intention of the legislature in conferring upon the land company the powers contained in its charter was that the company should exercise them itself. It was to do the mining and lumbering business, not some other corporation. If it had too much land to conduct mining and lumbering operations for itself on every part of it, it had ample power to sell the land. But it did not have power to subscribe to the capital stock of other corporations, and pay its subscription by deeding its lands and property to them. The deeds were, therefore, in fulfillment of an ultra vires contract. But it is claimed that, the contracts having been executed, equity will not set them aside, even though they were ultra vires. This question was not considered by the circuit judge in his opinion, and was probably not brought to his attention. The dismissal of the petition has been assigned for error and argued, but not fully. Indeed, it has been rather slighted by counsel on both sides. The subsidiary corporations were made parties to the intervening petition of Marbury & Jones, by subpoena duly issued, but of the five only the Kentucky Union Lumber Company answered. J. Kennedy Tod & Co., the complainants, answered the petition also. As already stated, the Kentucky Title & Land Company has reconveyed all the land received by it from the land company, and its case needs no consideration. No decrees pro confesso were taken against the corporations which did not answer. Issues of fact were raised by replication to the answers filed. No evidence seems to have been taken, especially directed to the issues thus raised, but enough appears in the record to show that large loans were made by third persons on the faith of the transfers of land to these various subsidiary corporations in every case except that of the Kentucky Title & Land Company, and that extensive improvements have been made on the land conveyed. Moreover, the stock and lands received for the land have been pledged by the land company to secure debts of its own. It is therefore apparent that, not only have all the contracts for the exchange of land for stock been executed, but that third persons, not parties to the intervening petition of Marbury & Jones, have invested money on the faith of the grants of the land on the one side and of the land company's ownership of the stock on the other. Without discussing the question whether creditors can set aside a completed exchange of land for stock as an illegal disposition of the assets of the corporation against them, because ultra vires, when the action is begun before third persons acquire any right in the land or the stock, we are very clear that it would be inequitable to set aside the transactions here complained of, in the absence of the third persons who have advanced money on the faith of their validity, and who have not been tendered the money advanced by them on the stock or invested by them in the lands sought to be recovered. The decree dismissing the intervening petition of Marbury & Jones was, therefore, rightly dismissed.

Fourth. The last question for our consideration is whether the distribution of the estate of the land company shall be according to the ordinary equitable rule, or in accordance with the Kentucky statute which governs the distribution of the estates of deceased insolvents.

We have decided, in the case of Bank v. Armstrong, 8 C. C. A. 155, 59 Fed. 372, that under the provisions of the national banking act for winding up insolvent national banks, which requires a ratable distribution on the allowed claims of creditors, all creditors, both secured and unsecured, are entitled to a pro rata distribution of the assets of the bank on their claims as they exist at the time of the declared insolvency, unaffected by collateral then held or by collections from collateral made after that time. In this we followed the general principles of equity, because there was nothing in the statute to prevent their application. This is the rule adopted by the court of appeals of Kentucky for distribution of an insolvent estate under a voluntary assignment for the benefit of all creditors. Logan v. Anderson, 18 B. Mon. 119; Bank v. Patterson, 78 Ky. 291. The statute under which this action was brought was passed in 1856, and is article 2 of chapter 44 of the General Statutes of Kentucky. By its first section that article provides that every act of any debtor, resorted to in contemplation of insolvency with the design to prefer creditors, "shall operate as an assignment and transfer of all the property and effects of such debtor, and shall inure to the benefit of all his creditors (except as hereinafter provided) in proportion to the amount of their respective demands, including those which are future and contingent." Section 2 provides that such transfers inuring to the benefit of creditors, generally, shall be subject to the control of courts of equity upon petition of any creditor filed within six months of the act of attempted preference. Section 3 permits any number to unite in such petition against the debtor and the transferee, and further provides that "the action and proceedings as to the mode of proving claims, and otherwise, shall be conducted as actions and proceedings for the settlement of the estates of deceased persons are now required to be conducted, so far as the same are applicable." Section 4 allows the appointment of a receiver by the court, and the compulsory transfer of all the property of the debtor to him, and the disclosure by the debtor of all his debts, etc. Section 5 provides that the court may make distribution from time to time, and that the allowance or disallowance of any claim at any distribution shall be a final judgment appealable as other final judgments. Section 7 is as follows: "In the distribution of the assets of any debtor, as provided, debts due as guardian or administrator or executor shall have priority; as also debts due as trustee, if the trust be created by deed or will duly recorded in the proper clerk's office." The last and eighth section provides that "the claims of creditors are required to be verified in the mode required by law in respect of claims against the estates of deceased persons before any portion of the assets shall be received therefrom."

The estates of insolvent decedents are distributed in Kentucky

under section 33 et seq. of article 2 of chapter 39 of the General Statutes of the state. Sections 33 and 34 are as follows:

"33. If the personal estate of a decedent be not sufficient to pay his liabilities, then the burial expenses of such decedent, and the costs and charges of the administration of his estate, and the amount of the estate of a dead person, or of a ward, or of a person of unsound mind, committed by a court of record to, and remaining in the hands of a decedent, shall be paid in full before any pro rata distribution shall be made; but this preference shall not extend to a demand foreign to this state. All other debts and liabilities shall be of equal dignity, and paid ratably in the administration of his estate; and should more than the ratable share of any debt be paid, his personal representative shall only receive credit for its proper proportion.

"34. When such an estate is covered by liens, giving a creditor a priority on such property, the proceeds thereof shall be first applied to the discharge of such lien, and the residue shall be subject to a pro rata division among the other creditors. But when any creditor has a lien, and the property subject to the lien is not sufficient to discharge the debt, he shall not be entitled to any portion of the residue of the estate, until all the creditors not having liens shall have received a sum equal, pro rata, with such lien creditor."

Sections 35, 36, and 38 prescribe the form of proof by affidavit required before a claim can be allowed, and section 37 provides that until such proof has been presented, and the claim rejected, no suit can be brought. It is obvious from section 34, above quoted, that the mode of distributing insolvent estates of decedents between secured and unsecured creditors is very different from that prevailing in equity, when unaffected by statutory restrictions. Which mode shall be adopted in the distribution of estates under the statute concerning fraudulent preferences? If this were a question of general equity jurisprudence, there would be no doubt that we ought to follow our previous decision in Bank v. Armstrong, supra. This was the view of the circuit judge. But the difficulty in doing so is that this is a proceeding governed by statute. That expressly prescribes in section 7 a priority in the distribution of the estate for fiduciary debts of the debtor identical with that prescribed in the statute for distributing the estates of insolvent decedents. It directs that claims against the estates of the insolvent shall be presented on the same proof and in the same form as that required against the estates of deceased insolvents. It directs that the action and proceedings as to the mode of proving claims or otherwise shall be conducted as in the settlement of estates of deceased persons. The distribution of the estates of dead insolvents and of living insolvents between secured and unsecured creditors would seem to be in pari materia. No reason occurs to us why the legislature should have made any distinction in the settlement and distribution of insolvent estates because the insolvent happened to be dead. In this view we do not think it a strained construction to hold that the general words "or otherwise" in the third section include "mode of distribution." It does not militate against this view that in a subsequent section there is a specific provision as to certain priorities in distribution, because there is also in a subsequent section a specific provision as to the mode of presenting claims.

The court of appeals of Kentucky have held that the mode of distribution under the two statutes must be the same. Though they

do not appear to give the same broad meaning to the words "or otherwise" in the third section as that above suggested, they reach the same result; not, as it seems to us, on principles of general equity jurisprudence, but as a construction of the intent and meaning of the legislature expressed in the fraudulent preference statute. The case is that of Bank v. Lockridge, 92 Ky. 472, 18 S. W. 1, and it presented the same question we have here. Judge Pryor, in delivering the opinion of the court, said:

"Section 34, art. 2, c. 39, Gen. St., provides the manner in which the estate of a debtor who dies insolvent shall be distributed, and is as follows: 'But when any creditor has a lien, and the property subject to the lien is not sufficient to discharge the debt, he shall not be entitled to any portion of the residue of the estate until all the creditors not having liens shall have received a sum equal pro rata with such lien creditor.' The distribution as between creditors, where the debtor dies insolvent, is made plain by this statute; and the question arises, did the legislature, in enacting the law to prevent fraudulent preferences, recognize or classify the estates of those passing by operation of law to creditors with the estates of insolvent decedents as to the mode of distribution? All such estates are subject to the control of courts of equity, and some equitable rule of distribution must be ascertained. It is apparent that the lawmaking power, when enacting the law in regard to sales, etc., in contemplation of insolvency, had in view the act regulating proceedings in the settlement of the estates of debtors who had died insolvent. Section 3 of article 2 of chapter 44 provides, where estates pass to creditors by operation of law, that 'the action and proceedings as to the mode of proving claims and otherwise shall be conducted as actions and proceedings for the settlement of the estates of deceased persons are now required to be conducted, so far as the same are applicable,' etc.; and by section 7 it is further provided 'that in the distribution of the assets of any debtor, as provided, debts due as guardian or administrator or executor shall have priority, as also debts due as trustees, if the trust be created by the deed or will, duly recorded in the proper clerk's office.' The statute has designated the claims of those who, under this operation of law passing the estate to creditors, shall have prior liens, following the priority given to claimants against the estates of those dead, showing plainly that the legislature regarded the act of insolvency as placing the estate of the insolvent debtor in the same condition, and to be distributed in the same manner as the estate of a decedent, while the third section of the act may apply to the mode of proceeding along, such as filing the petition and proving claims. A careful reading of both sections indicates that the legislature was attempting to regulate the mode of distribution as well as the mode of proceeding by the provisions of the statute 'with reference to the estates of deceased persons."

Certainly here was an attempt to determine the meaning and intent of the legislature from the language used by that body, and that is construction. The statute is a rule of property, and the construction of it by the court of appeals is controlling with federal courts. Said Mr. Justice Gray, speaking for the supreme court, in Union Bank of Chicago v. Kansas City Bank, 136 U. S. 223, 10 Sup. Ct. 1013:

"The question of the construction and effect of a statute of a state regulating assignments for the benefit of creditors is a question upon which the decisions of the highest court of the state establishing a rule of property are of controlling authority in the courts of the United States. Brashear v. West, 7 Pet. 608, 615; Allen v. Massey, 17 Wall. 351; Lloyd v. Fulton, 91 U. S. 479, 485; Sumner v. Hicks, 2 Black, 532, 534; Jaffray v. McGehee, 107 U. S. 361, 365, 2 Sup. Ct. 367; Peters v. Bain, 133 U. S. 670, 686, 10 Sup. Ct. 354; Randolph's Ex'r v. Quidnick Co., 135 U. S. 457, 10 Sup. Ct. 655."

It is sought to escape the effect of this principle by reference to the fact that the decision of the Kentucky court of appeals was not filed until after the decree of the circuit court declaring the fraudulent preferences was entered in this case. We do not think that this affects the question. The decree of distribution had not yet been made. In Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, the question was of the construction of a Missouri statute fixing liability of stockholders. The circuit court of the United States had given the statute what the supreme court of the United States thought to be a proper construction at a time when the Missouri supreme court had not expressed any opinion on it. Subsequently, after the decree of the United States circuit court was entered, and before the appeal from it was heard, the Missouri supreme court gave the statute another construction. This the supreme court of the United States refused to follow, but affirmed the circuit court on the ground that when the circuit court decree was entered the question was res integra. This case differs from that in the fact that here the decision of the Kentucky court was published before the circuit court was called upon to make distribution under the statute. More than this, as already stated, were the question res integra, we should be inclined to reach the same result as the court of appeals. The distribution of the land company's estate should be, therefore, in accordance with the rule prescribed by section 35 of article 2 of chapter 39 of the General Statutes of Kentucky, concerning estates of decedents.

The decree of the circuit court is reversed, with directions to take further proceedings in accordance with this opinion.