SMEAD and Others *v.* THE INDIANAPOLIS, PITTSBURGH, AND CLEVELAND RAILROAD COMPANY.

Under the original charter of the *Indianapolis and Bellefontaine Railroad Company*, that corporation had no general power to execute promissory notes and bills of exchange.

The company was chartered for the specific purpose of constructing a railroad from *Indianapolis* to the *Ohio* state line, to connect there with a certain *Ohio* railroad; and no express power to execute bills and notes being given, they could make only such as might be necessary or proper in carrying through that undertaking.

They could not execute accommodation paper, or paper to aid an undertaking

not contemplated by their charter; and such paper, if executed, would be void in the hands of an assignee.

A bill or note executed within the power of a corporation, but by an abuse of that power in the particular instance, would, if governed by the law merchant, be valid in the hands of a *bona fide* holder; but if executed entirely without the corporate power it would not, if, indeed, there could be a *bona fide* holder of such paper.

The charter of a corporation designed for the accomplishment of a particular object through the investment of the funds of private individuals, at all events if fairly obtained, is a contract, at least after interests have become vested under it, which the legislature cannot substantially impair without violating the constitution of the *United States.*

The legislature, therefore, cannot make compulsory amendments materially affecting rights under such a charter, unless by virtue of some reserved power.

But the legislature may alter such a charter with the assent of all the corporators; and that assent may be manifested in at least three ways—by asking the legislature to make the amendment; by expressly accepting an amendment enacted without request; and by acting upon and acquiescing in an amendment enacted without request.

The *Indianapolis and Bellefontaine Railroad Company,* by acting under § 3 of the general railroad act of 1853, accepted the same as an amendment to their charter.

Under their charter as thus amended they may execute notes or bills to pay the expense of altering the gauge of another railroad, to enable them to transport freight and passengers over it in their own cars; and their bills accepted on such a consideration would be valid.

APPEAL from the *Marion* Circuit Court.

PERKINS, J.—Suit by *Smead & Co.,* assignees of the *Greenville and Miami Railroad Company,* against the *Indianapolis and Bellefontaine Railroad Company,* upon five bills of exchange for 2,000 dollars each, of the following tenor:

" $2,000. *Cincinnati, December* 22, 1854. Nine months after date, pay to the order of the *Greenville and Miami Railroad Co.,* two thousand dollars, value received. *E. B. Taylor,* President, *G. and M. Railroad Co.* To *Indianapolis and Bellefontaine Railroad Co., Indianapolis.*"

Across the face of the bill was written—

" Accepted, payable at the *Ohio Life Ins. and Trust Co., Cincinnati. John Brough,* president, *I. and B. Railroad Company.*"

The bill was indorsed—" *E. B. Taylor,* President, *G. and M. Railroad Co.*"

*Nov. Term,*
**1858.**

SMEAD
v.
THE INDIANAPOLIS, &c.,
RAILRO'D CO.

*Tuesday,*
*November* 23.

Nov. Term,
1858.

SMEAD
v.
THE INDIAN-
APOLIS, &c.,
RAILRO'D Co.

. The defendants answered "that said bills of exchange in the complaint mentioned were accepted by said defendants and their agents without any legal authority or power whatever under the charter of said defendant, and said acceptances were *ab initio*, and still are, void in law, in this, that on the 22d day of *June*, 1854, the defendants and the *Greenville and Miami Railroad Company*, of *Ohio*, entered into the following agreement:

' *Indianapolis, Indiana, June* 22, 1854. The *Indianapolis and Bellefontaine Railroad Company*, of the state of *Indiana*, and the *Greenville and Miami Railroad Company*, of the state of *Ohio*, bodies corporate created by the laws of the states of *Ohio* and *Indiana*, contract and agree with each other as follows:

' 1. The *Indianapolis and Bellefontaine Railroad Company* agrees to accept drafts of the *Greenville and Miami Railroad Company*, ninety days from date for the aggregate sum of 15,000 dollars, to be drawn at such time as the necessities of the *Greenville and Miami Railroad Company* may require; in consideration of which the said *Greenville and Miami Railroad Company* hereby covenants and agrees to adopt and maintain on their road from *Union* to *Dayton* the *Ohio* gauge of four feet ten inches.

' 2. It is further agreed that the contract made and entered into, &c. (This section simply provides that some previous contracts remain in force.)

' 3. It is further agreed that at least one daily passenger train each way shall be run through, over the *Indianapolis and Bellefontaine* and *Greenville and Miami* railroads, without change of cars between *Indianapolis* and *Dayton*, through-tickets over both roads being sold at each end of the line, at such prices as may be mutually agreed on; other trains being arranged, as far as practicable, in such manner as to form suitable connections at *Union*. ·

' 4. The superintendents of the two roads, parties to this agreement, shall, from time to time, make and establish a tariff of prices for the transportation of freight between *Indianapolis* and *Dayton*, such company to receive its *pro rata* share of all such freight, in proportion to the length

of road over which the same may be carried; and at least one through freight train per day, each way, shall be run between *Indianapolis* and *Dayton*, in connection with the *Cincinnati, Hamilton,* and *Dayton* road, unless the superintendents of the roads shall otherwise agree.

' In witness whereof the party of the first part has caused these presents to be executed by its executive committee. And the party of the second part has caused these presents to be signed by the undersigned, special committee on its part.

' *S. Witt* and *Jas. H. Godman*, executive committee of *Indianapolis and Bellefontaine Railroad Company.*

' *E. B. Taylor* and *W. A. Weston*, special committee of the *Greenville and Miami Railroad Company.*'

And the defendants say that said two acceptances specified in said bill of particulars, [of 5,000 dollars each, dated *July* 1, 1854,] were acceptances made by said defendants, under said contract, which was and is void in law, and for no other consideration whatever; and the proceeds thereof went to the use of said *Greenville and Miami Railroad Company.* And the defendants further say that the said other acceptances of the said other five bills of exchange specified in the said special paragraphs in said complaint, were given and executed upon the renewal of said two acceptances of said two bills, and for no other consideration, of which facts the plaintiffs had notice. And the defendants say that they had no legal power to make said contract or acceptances under their charter, nor to give the said *S. Witt* and *Jas. H. Godman*, nor either of them, any power or legal authority whatever to make said contract. And the defendants further say that said acceptances were for the use and benefit of the *Greenville and Miami Railroad Company*, and the whole proceeds thereof went to the sole use of said company, and not to the use of defendants, of which plaintiffs had notice."

The plaintiffs replied, "that the defendants, the *Indianapolis and Bellefontaine Railroad Company*, now known by the name in which the defendants are sued, had lawful power to make said contract," &c.

Demurrer to this reply sustained; exceptions taken; and final judgment for the defendants.

There were other pleadings; but they need not encumber this opinion, as all the questions in the cause fairly arise upon those copied.

The demurrer, as to substance, reaches back through the previous pleadings.

The charter of the *Indianapolis and Bellefontaine Railroad Company* was granted in 1848; and the undertaking specified was to build a railroad from *Indianapolis* through *Winchester* to the *Ohio* state line, "for the purpose of connecting with a railroad proposed to be constructed from *Bellefontaine*, in *Ohio*, to the state line."

The charter contained this section:

"Sec. 60. This act may, at any time, be altered or amended at the request of said company, upon the application of the president and directors thereof."

In 1853, the legislature, under a proper title, enacted as follows:

"That any railroad company heretofore organized, or which may hereafter be organized, under the general or special laws of the state, and which may have constructed, or commenced the construction of their road, so as to meet and connect with any other road in an adjoining state, shall have the power to make such contracts and agreements with any such road, constructed in an adjoining state, for the transportation of freight and passengers, or for the use of its road, as to the board of directors may seem proper." Laws of 1853, p. 105, § 3.

In *June*, 1854, the article of agreement for a connection of roads was entered into between the *Indianapolis* and *Bellefontaine* and the *Greenville* and *Miami* companies, and bills of exchange pursuant thereto were drawn by the latter upon the former, by which company they were accepted.

In *December*, 1854, said bills were renewed.

In 1857, the bills upon renewal were unpaid, and this suit upon them was commenced.

The defense set up is, want of power in the corporation

to enter into the agreement and accept the bills in question.

Under the original charter of the *Indianapolis and Belle-fontaine Railroad Company*, that corporation did not possess a general power to execute promissory notes and bills of exchange. The company was created for the specific purpose of constructing a railroad from *Indianapolis* to the *Ohio* state line, to connect at that point with a certain *Ohio* railroad. No express power to execute bills and notes was given; and hence, the only power possessed to execute such paper was that which arose as incidental to the main undertaking, viz., the giving of such paper when necessary or proper in the carrying through that undertaking. It might give such paper to evidence indebtedness contracted in constructing the railroad, and providing for its connection with the *Ohio* road mentioned in its charter. It had no power, therefore, to execute merely accommodation paper, or paper to aid an undertaking not contemplated by its charter, and such paper executed by it would be void. It would be *ultra vires*. Such paper, it would seem, must be void in the hands of any assignee, because its issue would be outside of the power of the corporation. Would a note by an infant be valid in the hands of a *bona fide* holder? A bill or note executed within the power of the corporation, but by an abuse of the power in the particular instance, would, if governed by the law merchant, be valid in the hands of a *bona fide* holder; but when executed entirely without the corporate power, it would not, if, indeed, there could be a *bona fide* holder of such a bill. The corporation in question has power to accept a bill or give a note to a contractor for money due him for work on the road. Suppose, by an abuse of that power, the company give a commercial note, purporting to be for such a consideration, when nothing is due the contractor; being ostensibly for a purpose within the corporate power, it might be valid in the hands of a *bona fide* holder. Looking at the charter, he would discover authority for the note. *Hamilton* v. *The N. and D. R. Co.*, 9 Ind. R. 360. The *Greenville and Miami Rail-*

Nov. Term,
1858.

SMEAD
v.
THE INDIAN-
APOLIS, &c.,
RAILRO'D CO.

*road Company* is not one with which the *Indianapolis and Bellefontaine Railroad Company* was authorized to connect by its original charter; and the bills in suit were not given for any purpose specified in that charter. Hence, they are void, unless they were legitimately given under an amendment to the charter which binds the company.

It seems to be settled, that the charter of a corporation designed for the accomplishment of a particular object through the investment of the funds of private individuals, at all events, if fairly obtained, is a contract, at least after interests have become vested under it, which the legislature cannot substantially impair without violating the constitution of the *United States.* It cannot, therefore, make compulsory amendments, materially affecting rights under such charters. At the same time, charters for railroad companies, &c., are ostensibly granted for the promotion of the public good—are for the promotion of objects which the legislature might, and perhaps otherwise should, accomplish on the part of the state. Hence, the legislature, when authorizing a corporation to carry on such undertakings, may empower it to take private property, as being for the public use. And, certainly, the public have an interest in the great highways for travel and commerce throughout the state. It would seem, therefore, that the state ought to possess, independently, or by express reservation, some power, in every instance, to guard and secure that public interest. But it must be conceded that the law is that the legislature cannot force an amendment upon the charter of a railroad corporation, materially injurious to the stockholders of the company, unless by virtue of a reserved power. Judge PARKER, in *The Schenectady, &c., Co.* v. *Thatcher,* 1 Kernan, 102, says: "It is not certainly every extension of the main line, or construction of a branch, or change of route subsequent to subscription for stock, that will discharge a stockholder from his express agreement to pay for his stock. The change made may be unimportant, or may be, and in most cases doubtless is, beneficial to the stockholders; and where it is not claimed to be prejudicial, and the character of the contract

Nov. Term,
1858.

SMEAD
v.
THE INDIAN-
APOLIS, &C.,
RAILRO'D CO.

is not altered, there can certainly be no reason for allowing a dissatisfied stockholder to complain where he is not injured. 2 Watts and Serg. 156.—2 Penn. R. 466.—10 Barb. 277.—14 *id.* 559.—2 Russ. and Mylne, 470.—8 Mass. R. 270.—10 *id.* 385.—15 Pick. 363.—1 N. H. R. 44.—2 Am. Law Journal, N. S., No. 11, for *May*, 1850."

But the legislature can alter the charter of a corporation with the assent of all the corporators. That assent may be manifested in at least three ways—

1. By asking the legislature to make the alteration or amendment.

2. By expressly accepting an amendment enacted without request.

3. By acting upon, and acquiescing in, an amendment enacted without request.

In the case at bar, the legislature, in 1853, enacted an amendment to the charter of the *Indianapolis and Bellefontaine Railroad Company;* for the general section of the statute above quoted constituted an offered amendment to all the railroad charters in the state. The officers of that company acted under the amendment, and, for themselves, thereby accepted it. And perhaps, under the section of the charter above quoted, the directors had a right to accept amendments without consulting the stockholders. But, however that may be, we have no doubt, so far as appears by the record, that the stockholders have acquiesced. They are not objecting to it in this suit. They have filed no bill for an injunction to restrain the directors from acting under the amendment. The directors cannot, after having accepted the amendment themselves, volunteer a defense on behalf of the stockholders in this suit.

The amendment to the charter of the railroad company having been accepted, the question now arises—was the acceptance of the bill authorized by it? The amendment authorized the *Indianapolis and Bellefontaine Railroad Company* to make any contract with the *Greenville* and *Miami* road which its directors might deem proper, "for the transportation of freight and passengers, or for the use of its road." For this section, when construed in connec-

Nov. Term,
1858.

tion with the title of the act and preceding sections, must relate to any and all *Ohio* roads.

The *Indianapolis and Bellefontaine Railroad Company*, therefore, might make an arrangement to connect, as to time, the separate trains of the two roads, and thereby transport through passengers; or it might make a contract for the use of the *Greenville* and *Miami* road, and run its own cars over that road to *Dayton*. The *Indianapolis* and *Bellefontaine* road chose the latter arrangement; and it had the power, under the amended charter, to make all contracts necessary to carry out that arrangement. It might contract indebtedness for that purpose, and might give bills and notes therefor. Now, for the *Indianapolis* and *Bellefontaine* company to procure the successful use of the *Greenville* and *Miami* road, it was necessary to bring the tracks of both to the same gauge. The former road might have altered its gauge to that of the latter; but if it could more cheaply get the use of that road by paying a portion of the expense of altering its gauge, we think it was in the power of the *Indianapolis* and *Bellefontaine* road to do so.

The bills in question having been accepted upon that consideration, are valid.

*Per Curiam.* — The judgment is reversed with costs. Cause remanded for further proceedings in accordance with this opinion, with leave to the parties to amend the pleadings, &c.

*J. Morrison* and *C. Ray*, for the appellants.

*O. H. Smith*, *S. Yandes*, and *C. C. Hines*, for the appellees.