## PEARSALL v. GREAT NORTHERN RY. CO.[1]

### (Circuit Court, D. Minnesota. September 14, 1895.)

1. CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS — ACTS IMPAIRING CORPORATE FRANCHISES.

An accepted act of incorporation of a private corporation is a contract between the state and the corporation, and any law of a state which destroys or impairs any valuable franchise granted by such an act violates section 10, art. 1, of the constitution of the United States, which provides that no state shall pass any law impairing the obligation of contracts, and is ineffective, unless the right so to destroy or impair the franchise is reserved by the state before or at the time the charter is granted.

2. RAILROAD COMPANIES—GRANT AND ACCEPTANCE OF FRANCHISE.

The territory and state of Minnesota, by chapter 160 of the Laws of the Territory for 1856, and chapter 4 of the Special Laws of the State for 1865, granted to the Minneapolis & St. Cloud Railroad Company the right to build, operate, and lease railroads, and the right to consolidate its stock, its railroads, or its property with the stock, the railroads, or the property of any other railroad corporation. These grants were accepted by the corporation prior to 1866, and this corporation has, by a change of name, become the defendant, the Great Northern Railway Company.

3. SAME—RIGHT OF CONSOLIDATION.

The right to consolidate with another railroad corporation includes the right to make a fair and lawful agreement with it for the interchange of traffic, and for the joint use of terminal facilities, the right to buy one-half of its stock for the shareholders of the purchaser, and the right to guaranty the payment of its bonds.

4. SAME—VESTED RIGHTS—RESERVED POWER OF STATE.

This right to consolidate was a valuable and a vested right of the corporation after its acceptance of the grants; and section 17 of the act of 1856, which is: "This act is hereby declared to be a public act, and may be amended by any subsequent legislative assembly in any manner not destroying or impairing the vested rights of said corporation,"—did not reserve to the territory or to the state the power to impair or destroy this vested right.

5. SAME—VESTING OF FRANCHISES.

The use of a franchise granted to a corporation is not a condition precedent to the vesting in the corporation of the right to use it.

6. SAME — CONSOLIDATION — CONTROL OF PARALLEL ROADS — MINNESOTA STATUTES.

If chapter 29 of the Laws of Minnesota for 1874, and section 3 of chapter 94 of the Laws of Minnesota for 1881, which prohibit any railroad corporation from consolidating with or purchasing the stock of any corporation which owns or controls a parallel or competing line of railroad, should be construed to be amendments of the acts cited, they are broad enough in their terms to prohibit the defendant corporation from consolidating with any corporation which owns or controls the Northern Pacific System of railroads, and from purchasing one-half the stock of such a corporation for the use of its shareholders.

---

[1] Reversed by the supreme court, Mr. Justice Field and Mr. Justice Brewer dissenting. 16 Sup. Ct. 705.

**7. SAME—CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS.**

If they should be construed to be such amendments, they would impair to that extent the vested right of the defendant corporation to consolidate with any railroad corporation whatever, which was granted to it by its charter; and they would be ineffective, because they would be in violation of the constitutional provision that no state shall pass any law impairing the obligation of contracts, and also of the contract in the act of incorporation that the state would make no amendment destroying or impairing the vested rights of this corporation. Reversed in 16 Sup. Ct. 705.

**8. SAME.**

If these acts should not be construed to be amendments of the charter, they leave this right of the defendant to consolidate unaffected.

**9. SAME—CONTROL OF COMPETING LINE — AGREEMENT TO PURCHASE STOCK — INJUNCTION.**

In either case the agreement made by the Great Northern Railway Company to purchase one-half the stock of a new corporation which is to own or to control and operate the Northern Pacific System of railroads, many of which are lines either parallel to or competing with the lines owned or controlled and operated by the Great Northern Railway Company, to make a just and fair traffic agreement with this corporation, and to guaranty the payment of its bonds, is not rendered illegal by these acts, and its performance cannot lawfully be enjoined on account of them. Reversed in 16 Sup. Ct. 705.

This case came before the court upon a motion for a preliminary injunction, upon a bill and answer that disclose the following facts:

In 1856 the legislature of the territory of Minnesota passed "An act to incorporate the Minneapolis & St. Cloud Railroad Company" (Laws Minn. 1856, c. 160). By that act, the territory granted to that corporation the right to be a corporation, the right to acquire by purchase, gift, grant, devise, or otherwise, to hold and to convey, all such estate and property, real and personal, as should be necessary or convenient to carry into effect the object and purpose of the corporation (section 1); the right to construct and operate certain railroads (sections 2 and 6); the right to be part owner or lessee of any railroad in the territory (section 6); the right to exercise the power of eminent domain (section 7); and the right to connect with and to use any railroad running in the same general direction as any of its proposed railroads (section 12). The last section of the act is: "Sec. 17. This act is hereby declared to be a public act, and may be amended by any subsequent legislative assembly, in any manner not destroying or impairing the vested rights of said corporation." In 1865 the legislature of the state of Minnesota passed an act to amend the act of 1856, supra (Sp. Laws Minn. 1865, c. 4). By that act, the state granted to the Minneapolis & St. Cloud Railroad Company the right to connect with or adopt as its own any other railroad running in the same general direction with either of its main or branch lines (section 3); the right to consolidate the whole or any portion of its capital stock with the capital of any other railroad corporation having the same general direction or location (section 8); the right to consolidate any portion of its road and property with the franchises of any other railroad company, or any portion thereof (section 9); and the right to consolidate the whole or any portion of its lines of railroad, and the property pertaining thereto, with the rights, powers, franchises, grants, and effects of any other railroad (section 12).

It is alleged by the bill, and admitted by the answer, that the Minneapolis & St. Cloud Railroad Company was duly incorporated under and complied with the act of 1856 and its amendments, and that it duly accepted the provisions of the act of 1865 immediately after its passage. Subsequent to the year 1879, it constructed and put in operation a railroad from St. Cloud to Hinckley, in the state of Minnesota. After this railroad was constructed, it changed its name, by permission of the legislature of Minnesota, to the Great Northern Railway Company, and it is the defendant in this suit. It now owns some, leases some, and operates and controls all, of the lines of railroad of the Great Northern Railway System. This system comprises lines of railroad which extend from St. Paul and Duluth, in the state of Minnesota,

and from Superior, in the state of Wisconsin, across the states of Minnesota, North Dakota, Montana, Idaho, and to the towns of Everett and Seattle, in the state of Washington, with many branch and connecting lines; but none of these lines reach Tacoma, in the state of Washington, or Portland, in the state of Oregon, or Winnepeg, in Canada.

The Northern Pacific Railroad Company is a corporation organized under acts of congress, and it owns some, and, through its receivers, controls and operates all, of the lines of railroad of the Northern Pacific Railway System. This system comprises lines of railway extending from St. Paul, in Minnesota, and from Ashland, in Wisconsin, across the states of Minnesota, North Dakota, Montana, and Idaho, to Tacoma, in the state of Washington, and Portland, in the state of Oregon, with many branch and connecting lines, one of which extends to Winnepeg, in Canada. The aggregate mileage of each of these systems of railroad is about 4,500 miles, and some of the lines of each of these systems are parallel to and some of them compete with, lines of the other system. The Northern Pacific Railroad Company is insolvent, and its roads and property are in the hands of receivers, who were appointed by the courts at the instance of the holders of bonds which are secured by the second, third, and consolidated mortgages upon its property. The trustee for these bondholders has commenced suits to foreclose these mortgages, and the receivers are in possession under appointments in these foreclosure suits. The holders of a majority of the several classes of bonds secured by these three mortgages have agreed with the Great Northern Railway Company to procure a foreclosure sale of the property covered by these mortgages to a committee of these bondholders, for the benefit of all the holders of bonds secured by said mortgages; to organize a new corporation, in which they will cause the title to all of said mortgaged property to be vested, subject to the lien of the first and divisional mortgages of the Northern Pacific Railroad Company; to cause the new corporation to make a fair and reasonable traffic agreement with the defendant for an interchange of traffic between the two systems, and for the joint use of the terminal facilities of each whenever such use is convenient and economical for both; to cause the new corporation to issue its bonds to the amount of $100,000,000 or more, secured by a lien upon its property, to issue its full-paid capital stock to the amount of $100,000,000, and to cause its stockholders to transfer to the stockholders of the Great Northern Railway Company, or to some one for their use, one-half of this stock. In consideration of this agreement, the defendant corporation has promised to enter into the traffic agreement with the new corporation, and to guaranty the payment of the principal of its bonds and $6,200,000 interest thereon annually; and it is about to perform this promise, against the demand and protest of the complainant.

The complainant is the owner of 500 shares of the capital stock of the defendant corporation, which is now worth more than $62,500; and he avers that, if this agreement is performed, his stock will be depreciated more than $5,000. He brings this suit on behalf of himself and all other stockholders similarly situated who may join with him, and alleges that this agreement is unlawful, because it is beyond the powers of the corporation to make or perform it, because it is in violation of chapter 29 of the Laws of Minnesota for 1874, which is: "No railroad corporation, or the lessees, purchasers or managers of any railroad corporation, shall consolidate the stock, property or franchises of such corporation with, or lease or purchase the works or franchises of, or in any way control any other railroad corporation owning or having under its control a parallel or competing line; nor shall any officer of such railroad corporation act as an officer of any other railroad corporation owning or having the control of a parallel or competing line; and the question whether railroads are parallel or competing lines shall, when demanded by the party complainant, be decided by a jury as in other civil issues,"—and because it is in violation of section 3, c. 94, of the Laws of Minnesota for 1881, which is: "No railroad corporation shall consolidate with, lease or purchase, or in any way become owner of, or control any other railroad corporation, or any stock, franchises, rights of property thereof, which owns or controls a parallel or competing line." And he prays that the defendant may be enjoined from taking any steps towards its performance. The defendant answers that it has ample power to make and perform this agreement under

its charter; that the true construction of the provisions of the acts of 1874 and 1881, cited, is that they do not amend or affect its charter; and that, if the opposite construction is adopted, they are void in so far as they prohibit or affect its right to make and perform this agreement, because they are in violation of section 10, art. 1, of the constitution of the United States. The complainant replies that the right to so amend the charter of this defendant as to prohibit the performance of this agreement was reserved to the state by section 17 of the act of 1856, under which the defendant was incorporated, and that the laws of 1874 and 1881 were a constitutional exercise of this reserved right.

A. H. Young and H. J. Horn, for complainant.

M. D. Grover, Davis, Kellogg & Severance, and E. P. Sanborn, for defendant.

SANBORN, Circuit Judge. If there is any principle of jurisprudence that is beyond dispute and discussion in this nation, it is this: An accepted act of incorporation of a private corporation is a contract between the state and the corporation. Any law of a state which impairs or destroys a valuable franchise granted by such an act impairs the obligation of the contract, and is without effect, unless, before or at the time of the passage of the act, the state reserved the right to enact such a law. Const. U. S. art. 1, § 10; Dartmouth College Case, 4 Wheat. 518, 684, 693, 695, 703; Bank v. Knoop, 16 How. 369, 380; Binghamton Bridge Case, 3 Wall. 51; Sala v. New Orleans, 2 Woods, 188, Fed. Cas. No. 12,246; Railroad Co. v. Reid, 13 Wall. 264; Waterworks Co. v. Rivers, 115 U. S. 674, 6 Sup. Ct. 273; New Jersey v. Yard, 95 U. S. 104; New Orleans Gaslight Co. v. Louisiana, etc., Co., 115 U. S. 650, 6 Sup. Ct. 252; Monongahela Nav. Co. v. U. S., 148 U. S. 312, 13 Sup. Ct. 622; Mayor, etc., of City of Houston v. Houston City St. Ry. Co. (Tex. Sup.) 19 S. W. 127; Smith v. Railroad Co., 64 Fed. 272, 275; Boston & L. R. Corp. v. Salem & L. R. Co., 2 Gray, 1; Zimmer v. State, 30 Ark. 677; McRoberts v. Washburne, 10 Minn. 23 (Gil. 8); Washington Bridge Co. v. State, 18 Conn. 53; Citizens' St. R. Co., v. City Ry. Co., 56 Fed. 746; Citizens' St. R. Co. v. City of Memphis, 53 Fed. 715.

This contract is threefold. It is a contract between the state and the corporation, between the state and the stockholders of the corporation, and between the corporation and its stockholders. If the corporation threatens to do an act beyond the powers granted to it, in violation of law, and in violation of this contract, the stockholders are entitled to the mandate of the court to prevent it; and if, as the complainant alleges, the performance of the agreement which the defendant has made with the bondholders of the Northern Pacific Railroad Company is illegal, the complainant may successfully maintain this action for an injunction against it. Du Pont v. Railroad Co., 18 Fed. 467, 470; Beach, Priv. Corp. § 429, and cases cited.

It goes without saying that the right to make and execute the agreement assailed in this suit was a valuable privilege, and, if it is included in one of the franchises granted to the defendant, that was a valuable franchise. The principal questions presented in this case, therefore, are: Was the right to perform this agreement granted to the defendant by its act of incorporation and the subsequent

amendment thereof in 1865? If chapter 29 of the Laws of Minnesota for 1874 and section 3 of chapter 94 of the Laws of Minnesota for 1881 were amendments of this charter, does either of them prohibit the exercise of this right? Was the right to make such an amendment of the charter reserved to the state in the charter? Are the acts of 1874 and 1881 to be construed as amendments to this charter? These questions will be considered in the order in which they have been stated so far as it shall be necessary in order to determine whether or not an injunction ought now to issue as prayed.

An agreement between railroad corporations for an interchange of traffic at connecting points, and for the joint use of terminal grounds and facilities on reasonable terms, is a lawful contract. It is in accord with the public policy of the nation, and is a just and rational method of fulfilling the requirements of the "Act to Regulate Commerce," approved February 4, 1887 (24 Stat. 379; Supp. Rev. St. 529). U. S. v. Trans-Missouri Freight Ass'n, 7 C. C. A. 15, 78, 79, 58 Fed. 58. This is the character of the traffic contract contemplated by the agreement here assailed. Ample power to make such a contract, and to pay for it by a guaranty of the bonds of the new corporation, was granted to this defendant in the general authority to acquire such property as was necessary or convenient to carry into effect the object and purposes of the corporation, to operate a railroad, to become part owner or lessee of any railroad, and to connect with and use any railroad running in the same general direction as any of its roads, which is found in sections 1, 2, 6, and 12 of the act of 1856. Laws Minn. 1856, c. 160; Zabriskie v. Railroad Co., 23 How. 381, 390, 399; Green Bay & M. R. Co. v. Union Steamboat Co., 107 U. S. 98, 2 Sup. Ct. 221; Railroad Co. v. Howard, 7 Wall. 392, 411; Pittsburgh, C. & St. L. Ry. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371, 9 Sup. Ct. 770; Ft. Worth City Co. v. Smith Bridge Co., 151 U. S. 294, 299, 301, 14 Sup. Ct. 339; Harrison v. Railroad Co., 13 Fed. 522, 524; Tod v. Land Co., 57 Fed. 47, 60; Marbury v. Land Co., 10 C. C. A. 393, 62 Fed. 335; Smead v. Railroad Co., 11 Ind. 104, 112; Ellerman v. Stock-Yards Co., 49 N. J. Eq. 217, 248, 250, 23 Atl. 287; Rogers L. & M. Works v. Southern R. Ass'n, 34 Fed. 278; Low v. Railroad Co., 52 Cal. 53, 58; Opdyke v. Railroad Co., 3 Dill. 55, 70, 72, Fed. Cas. No. 10,546.

But this agreement is more than a traffic contract. It is an agreement that the defendant shall have the traffic contract for itself, and one-half of the stock of the new corporation for its shareholders, in consideration of its guaranty of the payment of the bonds of that corporation. Does the charter give it power to buy this stock in this way? The amendment of its charter made and accepted by it in 1865 grants to it the unrestricted right to consolidate with any other railroad corporation in every way in which the legislature could conceive that such a consolidation might be made. Sp. Laws Minn. 1865, c. 4, §§ 8, 9, 12. Section 8 gives it the power to consolidate the whole or any portion of its capital stock with the whole or any portion of the capital stock of any other railroad having the same general location or direction, or to become merged therein by way of substitution. Section 9 gives it the power to consolidate

any portion of its road and property with the franchises of any other railroad company, or any portion thereof; and section 12 gives it the power to consolidate the whole or any portion of its main lines or branch railroad and all the rights, powers, franchises, grants, and effects pertaining to such roads, with the rights, powers, franchises, grants, and effects of any other railroad either within or without the state. This unrestricted right to consolidate with any other railroad corporation includes the power to buy and destroy the stock of that corporation, and to pay for it by the issue to its shareholders of stock of the defendant. It includes this power because a consolidation may be legally effected in this way. Mor. Priv. Corp. § 942. If the defendant may buy all of the stock of the corporation, it may buy half of it. If it may pay for such stock by the issue of its own stock, it may do so by the payment of money, or by an absolute or conditional promise to pay money for it. The agreement in question contemplates the purchase of half of the stock of the new corporation, and payment for it by a conditional promise to pay a certain amount of the debts of that corporation if the latter fails to do so. The whole is greater than and includes all its parts; and, in like manner, the right to consolidate with a corporation includes a right to purchase a part or all of its stock for the use of shareholders of the purchasing company, and the right to pay for it by a guaranty of the payment of its bonds. There is no escape from the effect of this proposition on the ground that the defendant does not intend to completely consolidate with the new corporation, and hence that it has no authority to exercise the powers which it might exercise if it had that intention, nor on the ground that the new corporation, a part of the stock of which is to be purchased, is yet to be incorporated. The right granted to this defendant was to consolidate with any railroad corporation, and it was not limited by the time when, or the parties by whom, the latter was or should be organized. One who has authority to sell and convey another's land is not deprived of his authority to make a valid agreement of sale because he does not intend to convey, nor of his authority to convey because he first makes an agreement to sell in order that he may exercise his power to convey. The steps the defendant has agreed to take in this case tend towards the accomplishment of the purposes and objects of a consolidation, and they might all be lawfully taken in perfecting an actual consolidation. Upon the principle that the whole includes all its parts, the power to take them must be held to be included in the general right to consolidate granted by this charter. If there could ever have been any doubt of this proposition, it is now supported by judicial authority so eminent that this court ought not to depart from it. Branch v. Jesup, 106 U. S. 468, 478, 1 Sup. Ct. 495; Marbury v. Land Co., 10 C. C. A. 393, 404, 407, 62 Fed. 335; Tod v. Land Co., 57 Fed. 47, 56, 57; Green Bay & M. R. Co. v. Union Steamboat Co., 107 U. S. 98, 100, 2 Sup. Ct. 221; Hill v. Nisbet, 100 Ind. 341; Smead v. Railroad Co., 11 Ind. 104. An exhaustive and instructive opinion upon this question by the circuit court of appeals of the Sixth circuit will be found in Marbury v. Land Co., supra.

Does chapter 29 of the act of 1874 or section 3 of chapter 94 of the act of 1881, in terms, prohibit the performance of this agreement, if either of them is to be construed to be an amendment of this charter? Section 3 of the act of 1881 provides that no railroad corporation shall consolidate with, lease, or purchase, or in any way become the owner of, or control, any other railroad corporation, or any stock thereof, which owns or controls a parallel or competing line. The new corporation which this agreement contemplates will own or control many lines of railroad that are competing and some that are parallel with lines of the defendant. The defendant proposes to purchase one-half of the stock of this corporation, and a traffic agreement with it, and to pay therefor by a guaranty of its bonds. It matters not that it proposes that the stock purchased shall be issued to its shareholders. The defendant railroad company buys it, and, if it does not propose to own and control it, it does propose that its owners shall own and control it, and that is not an essential difference in the practical operation and effect of the scheme. The conclusion is that, if section 3 of the act of 1881 is an amendment of the defendant's charter, the performance of this agreement falls within its prohibition.

Was the right to impair or destroy the franchise to consolidate with another corporation reserved by the state at or before the granting of the charter? There was no such reservation unless it is contained in section 17 of the act of 1856, which reads: "This act is hereby declared to be a public act, and may be amended by any subsequent legislative assembly in any manner not destroying or impairing the vested rights of said corporation." The contention of counsel for the complainant that this section reserves to the state the power to take from the corporation all of its rights under the charter, except those rights of property which it has acquired, by purchase or otherwise, from parties other than the state, cannot be successfully maintained. Such a construction strikes from the section the words "not destroying or impairing the vested rights of said corporation," and gives it the effect of a reservation of the right to amend in any manner. The rights of property acquired from parties other than the state could not be taken from its stockholders without consideration under the reservation of the unlimited power to alter, amend, or repeal the charter. Greenwood v. Freight Co., 105 U. S. 13, 19; Kent v. Mining Co., 78 N. Y. 159, 182; Close v. Noye (Super. Buff.) 26 N. Y. Supp. 93; Hawthorne v. Calef, 2 Wall. 10. But the court is forbidden to strike from this provision of the act the limiting clause "not destroying or impairing the vested rights of said corporation," by the familiar rule that all the words of a law should have effect rather than that part should perish by construction. Knox Co. v. Morton, 15 C. C. A. 671, 68 Fed. 790; City of St. Louis v. Lane, 110 Mo. 254, 258, 19 S. W. 533. Again, a corporation has vested rights in all the valuable franchises granted to it by the state. The state excepted none of these rights from the provision of section 17. That provision was that it might amend the charter in any manner that did not, and that it would not amend it in any manner that did, affect any of the vested rights of the cor-

poration. The conclusive presumption from the fact that the legislature excepted none of these rights from this provision is that they intended to except none, and it is not in the power of the court to do so. Madden v. Lancaster Co., 12 C. C. A. 566, 573, 65 Fed. 188; Morgan v. City of Des Moines, 8 C. C. A. 569, 60 Fed. 208; McIver v. Ragan, 2 Wheat. 25, 29; Bank v. Dalton, 9 How. 522, 528; Vance v. Vance, 108 U. S. 514, 521, 2 Sup. Ct. 854. Moreover, if this task was undertaken, the unanswerable question would immediately present itself, what rights shall be excepted, and what shall not be?

It is difficult to perceive, after a patient examination of all the authorities cited on both sides of this case, and a careful consideration of the question, how this provision of the contract can be held to reserve to the state the right to pass any law which, in the absence of this provision, would have been in violation of section 10, art. 1, of the constitution. The plain effect of the provision is that the state will not amend this charter in any way that will impair or destroy the vested rights of the corporation, and that it may amend it in any other way. The provision of the constitution is that no state shall pass any law impairing the obligation of contracts. Any amendment that does not impair a vested right of the corporation under this contract does not impair its obligation, and any amendment that does impair its obligation necessarily impairs a vested right. Smith v. Railroad Co., 64 Fed. 272, 275. An application to section 17 of the ordinary rules of interpretation demonstrates that this is the true construction of the section. One of these rules is that the court may place itself in the place of the contracting parties for the purpose of discovering their intention, and that, when that intention is manifest, it will control, regardless of technical rules of construction. Binghamton Bridge Case, 3 Wall. 78, 80; Boston & L. R. Corp. v. Salem & L. R. Co., 2 Gray, 1; Prentice v. Forwarding Co., 7 C. C. A. 293, 58 Fed. 437, 443; Gunn v. Black, 8 C. C. A. 541, 60 Fed. 158; Witt v. Railway Co., 38 Minn. 122, 127, 35 N. W. 862; Driscoll v. Green, 59 N. H. 101; Johnson v. Simpson, 36 N. H. 91; Walsh v. Hill, 38 Cal. 481, 486, 487. Let us apply this rule.

In 1819, in the Dartmouth College Case, the supreme court had declared that the franchise granted to the trustees of Dartmouth College to elect their own successors was a valuable franchise, which the state of New Hampshire was prohibited by the constitution from destroying or impairing. In his opinion in that case, Mr. Justice Story had conclusively answered the argument now made by complainant's counsel in this case, that the only rights secured by this section are rights of property acquired from parties other than the state. He said:

"A grant of franchise is not, in point of principle, distinguishable from a grant of any other property." 4 Wheat. 684.

At page 697 he said:

"Another objection growing out of and connected with that which we have been considering is that no grants are within the constitutional prohibition, except such as respect property in the strict sense of the term,— that is to say, beneficial interests in lands, tenements, and hereditaments,

etc., which may be sold by the grantees for their own benefit; and that grants of franchises, immunities, and authorities not valuable to the parties, as property, are excluded from its purview. No authority has been cited to sustain this distinction, and no reason is perceived to justify its adoption.".

### At page 699 he said:

"In respect to corporate franchises, they are, properly speaking, legal estates, vested in the corporation itself, as soon as it is in esse. They are not mere naked powers, granted to the corporation, but powers coupled with an interest. The property of the corporation rests upon the possession of its franchises; and, whatever may be thought as to the corporators, it cannot be denied that the corporation itself has a legal interest in them."

### And at page 701 he said:

"Could the legislature of New Hampshire have seized the land given by the state of Vermont to the corporation, and appropriated it to uses distinct from those intended by the charity, against the will of the trustees? This question cannot be answered in the affirmative until it is established that the legislature may lawfully take the property of A., and give it to B.; and, if it could not take away or restrain the corporate funds, upon what pretense can it take away or restrain the corporate franchises? Without the franchises, the funds could not be used for corporate purposes; but, without the funds, the possession of the franchises might still be of inestimable value to the college, and to the cause of religion and learning."

In 1845 the legislature of the state of Ohio had passed a general banking law, which required banks to pay to the state 6 per cent. of their semiannual dividends in lieu of all other taxes. In 1847 the State Bank of Ohio had been incorporated under this law. In 1851 the legislature of Ohio had passed a general law which required banks in that state to pay a larger amount of taxes than was required by the law of 1845. In 1853 the supreme court had held that this provision of the law of 1851, which increased the tax, was unconstitutional, and that the bank was not required to pay the increased amount. Mr. Justice McLean, in delivering the opinion of the supreme court, had said:

"Every valuable privilege given by the charter, and which conduced to an acceptance of it and an organization under it, is a contract which cannot be changed by the legislature, where the power to do so is not reserved in the charter." Bank v. Knoop, 16 How. 369, 380.

In 1856 the legislature of the territory of Minnesota convened at St. Paul, more than 200 miles from the nearest railroad, with an area of fertile, but unoccupied, lands, stretching to the north and west of them, so vast and so distant from the commercial centers that there was no hope of its occupation or cultivation, until its products could be moved and the needs of its occupants could be supplied through railroad transportation. In this state of the law and of the territory they represented, this legislature sat bidding for the construction and operation of railroads through their territory. They offered to this railroad company the right to build and operate a railroad in a northerly direction from Minneapolis, and in a southerly direction, by way of West St. Paul, to Iowa, and the right to connect with and use any railroad running in the same general direction as either of these lines. Nine years passed, but no railroad had been built. The legislature amended their offer, and increased their bid. In addition to all the franchises granted in 1856,

they offered to this corporation, in various forms, the right to consolidate with any other railroad corporation whatever. These offers were accepted, and became the contract between the state and the company. The original contract of 1856 contained, and the amended contract of 1865 carried with it, the agreement that it might be amended by the state in any manner not destroying or impairing the vested rights of the corporation. The legislatures of some of the states had attempted to revoke or impair franchises that had been granted to corporations, and had been prevented from so doing by the decisions of the supreme court. That court had declared that every valuable privilege given by the charter which conduced to an acceptance of it or an organization under it was a contract which could not be changed by the legislature where the power to do. so was not reserved in the charter. Mr. Justice Story had declared that corporate franchises were legal estates vested in the corporation itself as soon as it was in esse. The legislature of Minnesota were offering every inducement in their power to secure the operation of railroads. What did they mean when they agreed with this corporation that they would not so amend its charter as to destroy or impair its vested rights? The question carries its answer. The conclusion is irresistible that they meant that they would never so amend that charter as to impair or destroy any franchises or rights of the corporation which the supreme court had declared vested as soon as it was accepted and rested under the protection of the constitution.

Another canon of interpretation is that, where the language of a contract or statute is unambiguous, it must be held to mean what it clearly expresses, and no strained or refined rule of construction can be applied to any part of it, to defeat it. Knox Co. v. Morton, 15 C. C. A. 671, 68 Fed. 789; U. S. v. Fisher, 2 Cranch, 358, 399; Railway Co. v. Phelps, 137 U. S. 528, 536, 11 Sup. Ct. 168; Bedsworth v. Bowman, 104 Mo. 44, 49, 15 S. W. 990; Warren v. Paving Co., 115 Mo. 572, 576, 22 S. W. 490. The natural and obvious meaning of the language contained in section 17 is that the legislature reserved the right to amend this charter in matters of form, procedure, and in other respects that would not affect the substantial rights of the corporation, and that they made no further reservation. Counsel for plaintiff urged as an objection to this construction that it leaves the rights of the state and of the corporation just where they would have been if section 17 had not been enacted. This is true, but this is where section 17 leaves these rights when every word it contains is given its natural and obvious meaning. This construction makes the section declaratory of the law as the supreme court had interpreted it, and it is not unusual for legislatures to pass acts declaratory of the general law. The circumstances under which the act was passed point with almost compelling force to the conclusion that this section was added to define and limit the extent of the power of amendment, and to assure the corporation that its substantial rights would not be assailed by the territory or the state; and, in any event, there is nothing in the act itself, or in the circumstances surrounding its enactment, to warrant this court in repealing or

ignoring both the general law and the statute which plainly declared it.

Another contention of counsel for the complainant is that section 17 should be construed to read: "This act is hereby declared to be a public act, and may be amended by any subsequent legislative assembly in any manner not destroying or impairing any rights of said corporation which have been exercised at the time of the amendment." And they maintain that, because the right to consolidate with another corporation had not been exercised by the defendant, when the acts of 1874 and 1881 were passed, the right was excepted from the saving clause of section 17, and was lawfully restricted. In support of this proposition, they cite Tomlinson v. Jessup, 15 Wall. 454; Miller v. State, Id. 478; Hamilton Gaslight & Coke Co. v. City of Hamilton, 13 Sup. Ct. 90; Shields v. Ohio, 95 U. S. 319, 324; Railroad Co. v. Maine, 96 U. S. 499, 510; Greenwood v. Freight Co., 105 U. S. 13; Newport & C. Bridge Co. v. U. S., Id. 470; Waterworks v. Schottler, 110 U. S. 347, 4 Sup. Ct. 48; Crease v. Babcock, 23 Pick. 334; In re Oliver Lee & Co.'s Bank, 21 N. Y. 9; Union Imp. Co. v. Com., 69 Pa. St. 140; Railroad Co. v. Smith, 47 Me. 34; City of Roxbury v. Boston & P. R. Co., 6 Cush. 424, 431; Railroad Co. v. Stamps (Ga.) 11 S. E. 442; Central Railroad & Banking Co. v. State, 54 Ga. 401. These authorities, however, do not make this distinction or support this proposition. A careful, patient examination of them discloses the fact that in every case except that of Newport & C. Bridge Co. v. U. S., 105 U. S. 470, the state had, prior to or at the time of the grant of the charter under consideration, expressly reserved to itself the unlimited power to alter or repeal it; and in the Bridge Company Case congress had reserved the right to withdraw its assent to the construction of the bridge, or to direct necessary modifications or alterations thereof, and by subsequent action, which was sustained, simply required some changes to be made in the construction of the bridge. These cases rest upon the acknowledged principle that when the state, before or at the time of the grant of a charter to a corporation, expressly reserves the right to alter or repeal it, that reservation becomes a part of the contract between the state and the corporation; and the franchises are then, by the express terms of the contract, revocable at the will of the state. This case is not ruled by these authorities, because, as we have seen, the territory and state did not reserve the power to alter or repeal this charter, but limited its reservation to the power to amend it "in any manner not destroying or impairing the vested rights of said corporation."

Every valuable franchise granted to this corporation vested in it when the act making the grant was accepted. The three great franchises granted were the franchise to build a railroad, to operate a railroad, and to consolidate with another railroad corporation. The chief value of every franchise is in its present or future use. It derives little value from the past. Section 17 was in effect a covenant against any amendment that would impair any vested right of this corporation. Can it be successfully maintained that the right to a franchise is never a vested right until the franchise is used?

Has a railroad corporation, after acceptance of its charter and organization, no vested right to condemn land for its road until it has condemned some, no vested right to build its road until it has built some, no vested right to run its engines and cars until it has run some, no vested right to collect tolls until it has collected some, and no vested right to consolidate with another corporation (where that franchise is granted in the charter) until it has consolidated with one? These questions carry their answers. There is no distinction, in reason or in the authorities, between the right to a franchise that has been and the right to one that has not been used, before the latter is forfeited for nonuser. The legal presumption is that each of the valuable franchises granted in a charter formed a part of the consideration for its acceptance, and the investment of capital in the stock of the corporation; and, as it is impossible to determine which of them formed the chief inducement, the right to those exercised first and the right used last vest alike in the corporation as soon as the grant which gives them is accepted, and they are all equally protected by the constitutional inhibition to impair the obligation of the contract both before and after they are used.

Sala v. New Orleans, 2 Woods, 188, Fed. Cas. No. 12,246, and Zimmer v. State, 30 Ark. 677, are cases in which rights to franchises that had never been exercised at all were held to be vested rights, and state legislation which attempted to impair these franchises before they were exercised was held to be in violation of the constitutional prohibition. And all cases of this class, from the Dartmouth College Case down, were necessarily cases in which state legislation attempted to impair the value of those portions of the franchises that had not been used,—the value of their use in the future, and not in the past. In Sala v. New Orleans, supra, the franchise to the city to issue bonds to pay for the waterworks, which was contained in the charter of the waterworks company, was impaired by onerous restrictions before it was exercised, and the act which restricted it was held ineffective. In Zimmer v. State the state of Arkansas attempted to impair, by a subsequent constitution, the franchise of a railroad corporation to consolidate with another before that franchise had been exercised; but the supreme court of that state held that this franchise could neither be withdrawn nor impaired by either a law or a constitution of the state. A franchise to consolidate with another corporation is incorporeal and intangible, but it is property, and often valuable property. Such a franchise cannot be taken for public use without condemnation and the payment of just compensation. Railroad Co. v. Reid, 13 Wall. 264; Montgomery Co. v. Bridge Co., 110 Pa. St. 54, 58, 20 Atl. 407; Monongahela Nav. Co. v. U. S., 148 U. S. 312, 341, 13 Sup. Ct. 622.

In the case last cited, Mr. Justice Brewer, delivering the opinion of the supreme court, and speaking of the franchise of the navigation company to take tolls, said:

"The franchise is a vested right. The state has power to grant it. It may retake it, as it may take other private property for public uses, upon the payment of just compensation. A like, though a superior, power exists

in the national government. It may take it for public purposes, and take it even against the will of the state; but it can no more take the franchise which the state has given than it can any private property belonging to an individual."

This is the last expression of the supreme court on this question, and it must conclude this discussion. The supreme court is the final arbiter upon all the questions that have been considered in this case. Its decisions are binding upon this court, and, whenever that court has decided a question that is afterwards presented here, it is the primary duty of this court to conform to that decision. Unless the opinions of the supreme court that have been cited have been misread, and their purport has been misconceived, they have decided every question that has been considered here, and left this court no power or duty but to follow those decisions. Unless the decisions of the supreme court from the Dartmouth College Case, in 1819, to the Case of the Navigation Company, in 1892, are to be disregarded, the franchise to consolidate with another railroad corporation was a vested right of this defendant from the time of its acceptance of its grant; and any law of the state which impaired that right was ineffectual, unless the power so to do was reserved by the legislature before or at the time of the grant. The legislature of Minnesota not only failed to reserve any such right, but, in effect, it contracted that the state would not impair any of the vested rights of the corporation by any amendment of the charter. If chapter 29 of the Laws of 1874 and section 3 of chapter 94 of the Laws of 1881 are to be construed to be amendments of this charter, they restrict and impair the right of this defendant to consolidate with any other railroad company, and to that extent they are ineffective.

A single question remains. It is whether or not chapter 29 of the Laws of 1874 and section 3 of chapter 94 of the Laws of 1881 should be construed to be amendments of the charter of the defendant. But it is unnecessary to determine that question in order to decide this preliminary motion. If they should be considered to be amendments of that charter, they are ineffective, for the reasons that have been stated; and, if they should not be deemed to be amendments of that charter, they leave it unaffected, and the right to consolidate unrestricted. In either event the agreement assailed in this case is not illegal on account of these statutes. For this reason this question will not now be considered, and the motion for the preliminary injunction will be denied.